1  **KATRINA M. PETRINI**
   **IN PRO SE**
2  **211 SOUTH NAVARRA DRIVE**
   **SCOTTS VALLEY CA 95066**
3  **Telephone: (831) 295-3101**

4
   **PLAINTIFFS IN PRO SE, KATRINA M. PETRINI AKA KATRINA POPOVICH**
5

6                    **UNITED STATES DISTRICT COURT**
7                   **NORTHERN DISTRICT OF CALIFORNIA**

8
   **KATRINA M. PETRINI,**
9                                        **CASE NO.**  CV 15 2493 NC
       **PLAINTIFFS,**
10                                       **COMPLAINT FOR DAMAGES**
   **VS.**                               **PURSUANT TO 42 U.S.C. § 1983,**
11                                       **PERMANENT INJUNCTIONS, AND**
   **SANTA CRUZ COUNTY HUMAN SERVICES**  **OTHER COMPENSATORY RELIEF**
12 **DEPARTMENT/FAMILY & CHILDREN'S**
   **SERVICES DIVISION, COUNTY OF SANTA CRUZ,**
13 **STATE OF CALIFORNIA, CAROLYN SPRAGUE,**
   **SHANNON SULLIVAN, SUPERIOR COURT**    **DEMAND FOR JURY TRIAL**
14 **JUDGE DENINE GUY, EVGUENIA VATCHKOVA,**
   **AMBER MUNOZ,**
15     **DEFENDANTS.**

16

17                         **JURISDICTION**

18

19        This court has jurisdiction under 28 U.S.C. § 1331. Federal questions jurisdiction arises

20  pursuant to 42 U.S.C. § 1983, by and through the 1st Amendment of the U.S. Constitution, 5th

21  Amendment of the U.S. Constitution, 6th Amendment of the U.S. Constitution, and 14th

22  Amendment of the U.S. Constitution.

23                           **VENUE**

24        Venue is proper pursuant to 28 U.S.C. § 1391 because the defendants are government

25  agencies, government officials, and the plaintiff and defendants live in the district.

26

27

28

                                -1-

1

**PARTIES**

2

**PLAINTIFF**

3       Plaintiff is Katrina M. Petrini aka Katrina Popovich brings this action in Pro Se. Plaintiff

4 brings this action pursuant to 42 U.S.C. § 1983, by and through the 1st Amendment of the U.S.

5 Constitution, 5th Amendment of the U.S. Constitution, 6th Amendment of the U.S. Constitution,

6 and 14th Amendment of the U.S. Constitution.

7

**DEFENDANTS**

8       Defendant, **Santa Cruz County Human Services/Family & Children's Services**

9 **Division**, also commonly known as CPS, they conduct business at 1400 Emeline Avenue,

10 Building K, Santa Cruz CA 95060.

11       Defendant, **County of Santa Cruz**, they conduct business at 701 Ocean Street, Room

12 210, Santa Cruz CA 95060.

13       Defendant, **State of California**, they conduct business at 455 Golden Gate Avenue, Suite

14 11000, San Francisco CA 94102.

15       Defendant, **Carolyn Sprague**, Senior Social Worker; in her official and individual

16 capacity, she conducts business at Santa Cruz County Human Resources/Family & Children's

17 Services, also commonly known as CPS, located at 1400 Emeline Avenue, Building K, Santa

18 Cruz CA 95060. License number unknown.

19       Defendant, **Amber Munoz**, Senior Social Worker; in her official and individual capacity,

20 she conducts business at Santa Cruz County Human Resources/Family & Children's Services,

21 also commonly known as CPS, located at 1400 Emeline Avenue, Building K, Santa Cruz CA

22 95060. License number unknown.

23       Defendant, **Shannon Sullivan**, Santa Cruz County Attorney; in her official and

24 individual capacity, she conducts business at the Office of the County Counsel, 701 Ocean Street,

25 Suite 505, CA 95060 and 12 W Beach Street, Room 272, Watsonville CA 95076. California

26 State Bar No. 182637. Admitted to the California State Bar in June 1996.

27

28

-2-

1    Defendant, **Superior Court Judge Denine Guy**, Superior Court Judge; in her official

2    and individual capacity, she conducts business at 1 Second Street, Watsonville, CA 95076, as

3    well as 701 Ocean Street, Santa Cruz CA 95060 and 3650 Graham Hill Road, Felton CA 95018.

4    California State Bar No. 145360. Admitted to the California State Bar in December 1989.

5    Defendant, **Evguenia Vatchkova**, Defense Attorney; in her official and individual

6    capacity, contracted with Santa Cruz County Human Resources/Family & Children's Services,

7    she conducts business at 343 Soquel Avenue, Santa Cruz CA 95062. California State Bar No.

8    196936. Admitted to the California State Bar in October 1998.

9                              **STATEMENT OF FACTS**

10   On January 13, 2015, I, Katrina M. Petrini and my 17 Year old daughter Sun Shine

11   Popovich were summoned to speak with Carolyn Sprague at 1400 Emeline Avenue, Building K,

12   Santa Cruz,  California. This was regarding Sun Shine's delinquent behavior.

13   On April 16, 2015, I Katrina M Petrini, was summoned to meet with Carolyn Sprague, at

14   1400 Emeline Avenue, Building K, Santa Cruz, California. This was regarding Sun Shine's

15   delinquency and Carolyn Sprague needed to complete a report and she needed more information

16   from me.

17   I was notified by Carolyn Sprague on this day that I was going to be prosecuted for Sun

18   Shine's actions under the term "general neglect". Carolyn Sprague also said that "I should give

19   my 17 year old daughter up for adoption" and that "if I fight the proceedings brought against me

20   and was successful that Sun Shine would be returned to my care". Sun Shine Popovich had been

21   taken into custody on March 17, 2015 by Juvenile Criminal Court for probation violations and

22   was placed in Juvenile Hall until March 20, 2015 immediately without notice to anyone she was

23   taken to a group home located in San Jose, California.

24   On March 25, 2015 at the Superior Court House, located at 1 Second Street, Watsonville,

25   California, Dept. B in front of Superior Court Judge John Gallagher, I was provided with the

26   complaint that outlined the allegations against me. On this date I was arraigned and charged with

27   "general neglect" pursuant to WIC §300 (b) and WIC §300 (c).  I was appointed counsel

28                                          -3-

Evguenia Vatchkova as my public defender. On the same day I was asked to either plead using the terms, submit or deny the charges being brought against me and I denied them through my public defender.

Without notice to Plaintiff Superior Court Judge John Ghallager was disqualified and Superior Court Judge Heather Morse whom also presided over Sun Shine Popovich's several criminal cases in the Juvenile Criminal Court in Santa Cruz County was the new presiding judge for the Juvenile Dependency Court.

On April 16, 2015 I provided a response to Carolyn Sprague with containing a 7 page typed response to each of the allegations along with 9 supporting exhibits as evidence. There were 160 pages of exhibits in total to support my responses to the allegations against me. Carolyn Sprague told me not to attend court on April 22, 2015. My seven page response was never provided to the court in Ms. Sprague's report and neither was the exhibit package consisting of 160 pages of evidence.   **(See Exhibit B consisting of my response to all allegations and 160 pages of exhibits.)**

On April 22, Plaintiff disqualified Superior Court Judge Heather Morse for conflict of interest by filing a Declaration for Premptory Disqualification pursuant to CCP § 170.6. Judge Heather Morse had presided over Sun Shine Popovich Juvenile Delinquency hearings.  At which point Superior Court Judge Denine Guy was appointed to preside over the subject case.

I prepared and filed the CCP §170.6 motion myself because my public defender failed to return several calls I had made to her.

On April 22, 2015 I received by first class mail a copy of "Jurisdiction/Disposition Report". This report is being used to slander me and offers no facts of law by which I could be charged and convicted by the District Attorney's office or be indicted and convicted by a Grand Jury. There are no allegations of physical abuse or any legal misconduct that could be considered illegal under a clearly definable law. The information contained within this report is primarily hearsay going so far as to deliver a medical opinion without the use of a medical doctor. This report is being deemed as fact before the court. **(See Exhibit A consisting of Jurisdiction/Disposition Report)**.

On May 12, 2015, there was a "Jurisdictional Hearing". On this day I was allowed to turn in a duplicate response to the allegations against me to the Judge through my appointed attorney that included the 7 page declaratory response and the 160 pages of exhibits that were missing from Carolyn Sprague's original report to the court. Judge Denine Guy had the report prepared by Carolyn Sprague for at least 21 days to review. At this hearing it would be determined whether I was innocent of the charges or guilty. If found guilty I would be forced to endure the humiliation and harm of incalculable loss of being deemed an unfit neglectful mother and I would be forced to endure their undocumented re-educational programs. I would also be put at extreme risk of losing my daughter Sun Shine and my other three minor children to Santa Cruz County Human Services/Family & Children's Services Division. I demanded a trial at this point and I was informed by my attorney that there would be no jury and that the evidence that was brought before the judge by the county is considered fact and that hearsay evidence is admissible as fact. Judge Denine guy had thoroughly reviewed the Jurisdictional Report prepared Carolyn Sprague and had yet to look at my response that I was just allowed to provide to the court.

During this hearing we were scolded by Judge Denine Guy that the hearing was confidential and could not be spoken about outside the courtroom specifically speaking to my husband, Bunker Rogge, no outside parties were allowed in the courtroom except for an advocate provided to me by the Santa Cruz County Juvenile Probation Department. The superior court room was equipped with a Santa Cruz County Sheriff Bailiff who had a gun on his hip and a certified court reporter. **(See Exhibit C which is a photo of the court room under "Closed Hearings".)**

The prosecutors are not members of the Santa Cruz County District Attorney's Office but work in the capacity as Santa Cruz County attorneys. Shannon Sullivan is Santa Cruz County Counsel.

The attorney provided to me, Evguenia Vatchkova, is not a member of the Public Defenders office, rather, she has a contract with the County of Santa Cruz to represent those going through juvenile dependency court proceedings.

On June 2, 2015, there was a settlement conference. This settlement conference consisted

1  of a meeting between all attorneys without a mediator. The attorneys met privately in the court

2  room without any involved parties. My attorney came back and gave me a "take it or leave it

3  offer" which did not include an option for dismissal and when I made my counter-offer I was told

4  that no counter would be accepted. My counter offer was not delivered to County Counsel.

5      My appointed attorney, again, reminded me on June 2, 2015 that the petition being

6  brought against me allows hearsay evidence as fact and then my attorney told me that I was not

7  allowed to include any hearsay evidence in my own response.

8      On June 10, 2015, there is to be a closed non-public trial without a jury. The court will be

9  considering hearsay evidence as fact and considering medical conclusions without a physician

10  involved and without a physician medical license. If I am found guilty I will be sentenced to a re-

11  educational program for 18 months until I am properly re-educated to the standard that Santa

12  Cruz Human Services/Family & Children's Services Division deems to be fit in their

13  undocumented opinion. I will be required to allow Santa Cruz Human Services/Family &

14  Children's Services Division  and their agents access to my private medical records from a

15  therapist and physicians that I will be appointed to by Santa Cruz Human Services/Family &

16  Children's Services Division for re-education. If I fail to comply I will risk losing my daughter

17  Sun Shine and my other three children which is the worst punishment imaginable, not even a

18  death sentence is worse than the loss of my children. The punishment is substantial. (**See Exhibit**

19  **D Consisting of  Santa Cruz Human Services/Family & Children's Services Division  re-**

20  **education requirements and Authorization for Release of Records.**)

21      On May 6, 2015 I received the Santa Cruz Human Services/Family & Children's Services

22  Division exhibit portion of their report which included more hearsay. Again no actual/factual

23  evidence of any wrongdoing by which the District Attorney's office would prosecute me or a

24  Grand Jury would issue an indictment.

25      In reviewing the law WIC 300 (b) & (c) for my defense I discovered there is no standard

26  by which a person could comply with this law. The law appears to be deceiving allowing a

27  prosecutor to make up any list of allegations and the defendant would be found guilty as there is

28  no standard by which a person could knowingly comply with the law.  Leaving any defendant

1   without any possible defense as there is no standard to follow.

2       My daughter, Sun Shine Popovich is still being detained and has been in detention for 75

3   days. She has not committed any crimes and she is not under a probationary hold and she does

4   not know when she will be released. She will be filing a Writ of Habeas Corpus to obtain her

5   freedom. I have not been deemed a neglectful mother and hearings have been postponed or

6   delayed and there has been no concluding Jurisdictional hearing to date.

7       I am filing this complaint at this time due to my fear of losing my daughter Sun Shine and

8   my other three children and becoming another victim of government sanction child trafficking by

9   Santa Cruz County Human Services/Family and Children's Services Division.

10   **ARGUMENTS**

11   **FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR VIOLATION OF**

12   **PLAINTIFF'S FEDERAL CIVIL RIGHTS PURSUANT TO (42.U.S.C.§ 1983)**

13   **CRIMINALLY PROSECUTING AN ADULT IN A CLOSED COURT**

14       Plaintiff realleges all paragraphs set forth above and incorporates them by reference as

15   though they were fully set forth in this cause of action.

16       From March 24, 2015 and continuing to the present, Defendants, and each of them, have

17   engaged in and continue to engage in, aided and abetted and continue to aid and abet, and

18   conspired to and continue to conspire to engage in acts or practices that constitute violations of

19   Plaintiff's Federal Civil Rights pursuant to 42 U.S.C. §1983.

20       I am constitutionally entitled to a public trial. The 6th Amendment of the U.S.

21   Constitution provides the accused shall enjoy the right to a speedy and public trial. A closed

22   court room is a place where governmental injustice often takes place throughout the world. I do

23   not want to be a victim of such injustice and a public trial offers me the most protection. The

24   closed non-transparent courtroom makes a defendant feel isolated, vulnerable and is

25   automatically a place to instill fear and being subjected to governmental tyranny through

26   isolation which causes fear. Therefore, I demand a public trial.

27   //

28

1   **SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR VIOLATION OF**

2   **PLAINTIFF'S FEDERAL CIVIL RIGHTS PURSUANT TO (42.U.S.C.§ 1983)**

3   **CRIMINALLY PROSECUTING A CITIZEN WITHOUT A JURY**

4   Plaintiff realleges all paragraphs set forth above and incorporates them by reference as

5   though they were fully set forth in this cause of action.

6   From March 24, 2015 and continuing to the present, Defendants, and each of them, have

7   engaged in and continue to engage in, aided and abetted and continue to aid and abet, and

8   conspired to and continue to conspire to engage in acts or practices that constitute violations of

9   Plaintiff's Federal Civil Rights pursuant to 42 U.S.C. §1983.

10   A jury trial is a fundamental keystone of our judicial system and I am entitled by the U.S.

11   Constitution as provided in the 5th and 6th Amendments of the U.S. Constitution to speedy and

12   public trial, by an impartial jury of the State and district wherein the crime was allegedly

13   committed. The defendants are enforcing Welfare & Institutions Code §§300 (b) and (c) which

14   carries a substantial punishment of re-education, which could cause my part-time incarceration to

15   last for a period of 18 months or longer.  Although they provide an outline of their re-education

16   punishment there are no specified time limitations or methods that are going to be used.

17   **THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR VIOLATION OF**

18   **PLAINTIFF'S FEDERAL CIVIL RIGHTS PURSUANT TO (42.U.S.C.§ 1983)**

19   **CRIMINALLY PROSECUTING A CITIZEN USING HEARSAY EVIDENCE**

20   Plaintiff realleges all paragraphs set forth above and incorporates them by reference as

21   though they were fully set forth in this cause of action.

22   From March 24, 2015 and continuing to the present, Defendants, and each of them, have

23   engaged in and continue to engage in, aided and abetted and continue to aid and abet, and

24   conspired to and continue to conspire to engage in acts or practices that constitute violations of

25   Plaintiff's Federal Civil Rights pursuant to 42 U.S.C. §1983.

26   The laws of evidence are put in place to protect the innocent from wrongful prosecution.

27   The 6th Amendment of the Constitution allows the accused to confront the witnesses against

28   her/him and to have the compulsory process for obtaining witnesses in her/his favor.

California Rules of Court Rule 5.684 (c) and California Rules of Court Rule 5.684 (d) allows hearsay evidence which is in violation of my 6th Amendment privilege provided by the U.S. Constitution as stated above. These California rules of court interfere with my right to confront my accusers and therefore I demand any accuser to be brought forward to testify in court and not be allowed to testify through hearsay.

**FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR VIOLATION OF PLAINTIFF'S FEDERAL CIVIL RIGHTS PURSUANT TO (42.U.S.C.§ 1983) CRIMINALLY PROSECUTING A CITIZEN USING UNQUALIFIED EXPERT TESTIMONY AS EXPERT TESTIMONY**

Plaintiff realleges all paragraphs set forth above and incorporates them by reference as though they were fully set forth in this cause of action.

From March 24, 2015 and continuing to the present, Defendants, and each of them, have engaged in and continue to engage in, aided and abetted and continue to aid and abet, and conspired to and continue to conspire to engage in acts or practices that constitute violations of Plaintiff's Federal Civil Rights pursuant to 42 U.S.C. §1983.

The defendants are engaged in the unlawful practice of delivering a medical conclusion as evidence without any expert testimony relating to a case of poison oak and my daughter Sun Shine. California State Evidence Code 720 requires (a) A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. Against the objection of a party , such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert.

California Rules of Court rule 5.684 (b) requires defendant Carolyn Sprague, Social Worker, to testify in support of the hearsay evidence she supplied in her report to the court which contains a medical conclusion without a medical expert's involvement.

**FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR VIOLATION OF PLAINTIFF'S FEDERAL CIVIL RIGHTS PURSUANT TO (42.U.S.C.§ 1983) CRIMINAL PROSECUTION OF A CITIZEN PRESUMED GUILTY UPON THE**

**ONSET OF THE PROCEEDINGS BY THE JUVENILE DEPENDENCY COURT**

Plaintiff realleges all paragraphs set forth above and incorporates them by reference as though they were fully set forth in this cause of action.

From March 24, 2015 and continuing to the present, Defendants, and each of them, have engaged in and continue to engage in, aided and abetted and continue to aid and abet, and conspired to and continue to conspire to engage in acts or practices that constitute violations of Plaintiff's Federal Civil Rights pursuant to 42 U.S.C. §1983.

In Juvenile Dependency Detention hearings in making its prima facie determination the court must consider un-rebutted evidence (such as the social worker's report) to be true, making the presentation of rebuttal evidence critical. The rebuttal evidence that I provided in the form of a seven page written response to allegations and 160 pages of exhibits were purposely omitted and missing. Defendant, Carolyn Sprague, intentionally deprived the court of necessary rebuttal evidence in order to deceive the court in finding in favor of her report.

**SIXTH CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR VIOLATION OF PLAINTIFF'S FEDERAL CIVIL RIGHTS PURSUANT TO (42.U.S.C.§ 1983) USING JUVENILE DEPENDENCY COURT FOR CRIMINAL PROSECUTIONS**

Plaintiff realleges all paragraphs set forth above and incorporates them by reference as though they were fully set forth in this cause of action.

From March 24, 2015 and continuing to the present, Defendants, and each of them, have engaged in and continue to engage in, aided and abetted and continue to aid and abet, and conspired to and continue to conspire to engage in acts or practices that constitute violations of Plaintiff's Federal Civil Rights pursuant to 42 U.S.C. §1983.

California Juvenile Dependency Court is engaged in the prosecution and punishment of adults in a closed forum where all named defendants, Santa Cruz County Human Services/Family and Children's Services Division, Judge Denine Guy, Shannon Sullivan, Evgenia Vatchkova, Carolyn Sprague, County of Santa Cruz and the State of California are able to withhold most if not all constitution rights and privileges under a conspiratorial effort and fraudulent front of a non-transparent dependency court . The lack of transparency or public scrutiny allows the court

to make victims of its accused defendants in a secret forum which is nothing more than a dark closet.

The removal of constitutional privileges in the California Juvenile Dependency Court is so flagrant and arrogant that the orchestrators seem drunk with unchecked power.

Defendants and each of them violated the federal constitutional rights of the Plaintiff by:
a. Summarily seizing the child from her home, parent, and family care without a warrant, just or probable cause, and absent exigent circumstances, in violation of several sections of the California Welfare and Institutions Code and the Fourteenth Amendment of the United States Constitution.

b. Crafting counterfeit allegations presented to the court on the initial verified petition (WIC 300 (b) & (c)).

c. Withholding exculpatory evidence that may well have changed not only the Detention Hearing findings, orders, and outcomes, but those of every subsequent hearing pursuant to WIC §315.

d. Not timely releasing the child or holding the Detention Hearing pursuant to WIC §315 and WIC §319 (e) & (f).

e. Conducting a defective and one-sided investigation into the facts concerning the suitability of the child's home and not immediately uniting mother and daughter, and ignoring clear and obvious indications that this was appropriate and necessary for the family's health and well being.

These official policies, customs, practices, and/or directives of Defendants are causally and affirmatively linked to the deprivation of the Plaintiff's constitutional rights and were used, relied upon, and carried out by defendant social workers who in turn targeted Plaintiff through their iniquitous and malevolent conduct without fear of sanction or reprisal.

These policies, customs, practices, and/or directives of Defendants are causally and affirmatively linked to the deprivation of Plaintiff's constitutional rights and yet remain standard and routinely relied upon by Defendants even where they are not formally or publically enacted.

The Defendants' conduct was a major cause of the lengthy separation of mother

-11-

(Plaintiff) and daughter, causing physical, emotional, and economic injuries to Plaintiff, in amounts to be proven at trial, in violation of laws including but not limited to the 1st, 5th, 6th and the 14th Amendment of the Constitution of the United States and 42 U.S.C. § 1983.

Throughout the subject proceedings, Defendants' conduct was malicious and oppressive and was intended to cause injury if not carried out with deliberate indifference to and callous disregard of Plaintiff's rights and well-being, justifying an award of punitive damages as to individual defendants.

## SEVENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR VIOLATION OF PLAINTIFF'S FEDERAL CIVIL RIGHTS PURSUANT TO (42.U.S.C.§ 1983) UNTIMELY DUE PROCESS, INTENTIONAL DEPRIVATION OF INITIAL JUVENILE DEPENDENCY DETENTION HEARING, 72 HOURS DETENTION WITHOUT A HEARING, INTENTIONAL DESTRUCTION OF RELEVANT EVIDENCE AND COLLUSION BETWEEN COUNSEL

Plaintiff realleges all paragraphs set forth above and incorporates them by reference as though they were fully set forth in this cause of action.

From March 25, 2015 and continuing to the present, Defendants, and each of them, have engaged in and continue to engage in, aided and abetted and continue to aid and abet, and conspired to and continue to conspire to engage in acts or practices that constitute violations of Plaintiff's Federal Civil Rights pursuant to 42 U.S.C. §1983.

Sun Shine Popovich was detained in Santa Cruz County Juvenile Hall from March 17, 2015 and released from Juvenile Hall on March 20, 2015. On March 20, 2015 she was then taken to California Anchor Resident, Inc., a licensed group home facility, located in San Jose, California, without a court order. As of the time of the filing of this complaint Sun Shine Popovich has been held for 77 days without cause.

Santa Cruz County Human Services/Family and Children's Services Division initial report was not completed until April 22, 2015.

The Detention/Arraignment hearing was on March 25, 2015. The rebutting evidence which consisted of a seven page type-written response to all allegations by Plaintiff and 160

pages of supporting evidence was purposely omitted and missing from the Santa Cruz County Human Services/Family and Children's Services report provided to the court on April 22, 2015.

The Jurisdictional Hearing took place on May 12, 2015 with no results.

Since Sun Shine has been detained the entire time since the detention hearing during this process according to the WIC §319 (f) establishing the time-line for Juvenile Dependency hearings when children are taken in to the custody there should have been an adjudication on the Jurisdictional Hearing within 15 days of Sun Shine's detention.

At no time during this process has my attorney Evgenia Vatchkova informed me of any untimely filings or untimely hearing dates; she failed to inform me of the presiding judge's substitution and I had to prepare my own judicial premptory challenge to disqualify a biased judge. Evgenia Vatchkova has failed to attend any Santa Cruz County Human Services / Family and Children Services Division interrogations and when I asked her to attend she said it wasn't necessary and I should cooperate with Santa Cruz County Human Services/ Family and Children Services Division. These actions add to the seclusion that the accused (including myself) already suffer in a closed forum judicial setting. In these meetings legal documents are placed in front of the accused for signature and there is no viable legal representation present. Most people sign these documents under duress manufactured by the closed forum theory where everything is a secret. I signed the first set of documents and then understood clearly that I was being oppressed and my rights were being deprived and I have no viable legal representation therefore by the second set of documents I decided not to sign them and I was told that my lack of cooperation would be reported to the court.

Again, it is very obvious this court does not follow even the California Rules of Court or any part of the U.S. Constitution. These blatant violations are just another example of these court officers' drunkenness with unchecked power and unconcern of any outside monitoring of their dark court. These officers of this court preside over their court as they please in violation of due process and the law.

In the seminal case In re Rocco M. (1991) 1 Cal. App. 4th 814, 820, the appellate court held that in order to sustain a dependency under section 300 (b), the juvenile court must find

-13-

1   substantial evidence that, at the time of the Jurisdictional hearing, the following three elements

2   are met: 1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3)

3   serious physical harm or illness to the minor or a substantial risk of such harm or illness. The

4   long line of cases that follow Rocco M. reach the conclusion that "the purpose of section 300,

5   subdivision (b) is to protect the child from a substantial risk of future serious physical harm and

6   that the risk is determined as of the time of the Jurisdictional Hearing. (In re J.N. (2010) 181 Cal.

7   App. 4th 1010, 1023; see also In Re James R. (2009) 176 Cal. App. 4th 129; In re Savannah M.

8   (2005) 131 Cal. App. 4th 1387; In Re David M. (2005) 134 Cal. App. 4th 822).

9        On May 12, 2015 the Jurisdictional Hearing took place and no determination was made

10  and Sun Shine remained in custody without the required court order and the case against me is

11  set for trial on June 10, 2015. Welfare and Institutions Code §319 (e) & (f) requires if the child is

12  detained they may be placed in a licensed place for no longer than 15 days. Sun Shine Popovich's

13  detention has lasted 77 days with no determination by any court that I have been deemed a

14  neglectful or unfit mother.

15  **EIGHTH CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR VIOLATION OF**

16  **PLAINTIFF'S FEDERAL CIVIL RIGHTS (42.U.S.C.§ 1983)**

17  **UNEQUAL PROTECTION PURSUANT TO THE 14TH AMENDMENT OF THE U.S.**

18  **CONSTITUTION**

19       Plaintiff realleges all paragraphs set forth above and incorporates them by reference as

20  though they were fully set forth in this cause of action.

21       From March 24, 2015 and continuing to the present, Defendants, and each of them, have

22  engaged in and continue to engage in, aided and abetted and continue to aid and abet, and

23  conspired to and continue to conspire to engage in acts or practices that constitute violations of

24  Plaintiff's Federal Civil Rights pursuant to 42 U.S.C. §1983.

25       Plaintiff has been classified as a violator of Welfare and Institutions Code §300. People

26  who are accused of violating WIC §300 are placed in a group and treated differently than people

27  who are accused of other crimes. People who are put into this classification are limited to the

28  amount of civil rights that are delivered and public oversight. People who are not placed in this

1  classification are granted all of their civil rights and enjoy the protection of a public forum.

2  People who are classified in this group have their civil rights withheld including but not limited

3  to the following: their U.S. Constitutional 6th Amendment rights of a public forum has been

4  removed, the U.S. Constitutional 6th Amendment right of speedy jury trial has been removed, the

5  U.S. Constitutional 6th Amendment right from facing my accusers has been removed through the

6  use of hearsay evidence as fact, the elimination of exculpatory evidence, U.S. Constitutional 1st

7  Amendment Rights violation as alleged below in the complaint against me and my due process

8  rights under the 5th Amendment have been violated in that I have not and will not be given a

9  meaningful opportunity to be heard before I am deprived of my fundamental right to raise my

10  children, as well as other rights of freedom.

11  **NINTH CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR VIOLATION OF**

12  **PLAINTIFF'S FEDERAL CIVIL RIGHTS PURSUANT TO (42.U.S.C.§ 1983)**

13  **INFRINGING UPON A CITIZENS' U.S. 1ST AMENDMENT CONSTITUTIONAL**

14  **RIGHTS THROUGH DEFENDANTS COMPLAINT AND RE-EDUCATION PROGRAM**

15  Plaintiff realleges all paragraphs set forth above and incorporates them by reference as

16  though they were fully set forth in this cause of action.

17  From March 24, 2015 and continuing to the present, Defendants, and each of them, have

18  engaged in and continue to engage in, aided and abetted and continue to aid and abet, and

19  conspired to and continue to conspire to engage in acts or practices that constitute violations of

20  Plaintiff's Federal Civil Rights pursuant to 42 U.S.C. §1983.

21  Under the privileges of the U.S. Constitution 1st Amendment I have the right to freedom

22  of speech whether or not the Juvenile Dependency Court agrees with my speech, opinions, and

23  attitude which are all part of my ability to speak freely so long as they are not clearly definable as

24  criminal acts.

25  The complaint that has been brought against me by Santa Cruz County Human

26  Resources/Family Children's Service contains allegations relating to my speech, attitude,

27  opinions and method of thinking. All of which are fundamental in the use of my 1st Amendment

28  right of freedom of speech. To change the way I think or my attitude would directly affect my

freedom of speech. I would no longer being saying what I wanted to say but I would be saying what I was taught to say by the Santa Cruz County Human Resources/Family Children's Service. The subject complaint filed against me in Juvenile Dependency Court is being used as a tool to stifle my ability to maintain true freedom of speech.

The Juvenile Dependency Court has outlined the curriculum being instituted described in the following 9 "Service Objections":

1.Show that you know age appropriate behavior for your child.

2. Be nurturing and supportive when you visit your child.

3. Comply with medical or psychological treatment.

4. Consistently, appropriately and adequately parent your child.

5. Maintain relationship with your child by following the conditions of the visitation plan.

6. Meet your child's physical, emotional, medical and educational needs.

7. Protect your child from emotional harm.

8. Pay attention to and monitor your child's health, safety, and well-being.

9. Show your ability to supervise, guide, and correct your child at home, school, and in the community.

I do all of these things perfectly however it does not seem to meet Santa Cruz County Human Resources/Family and Children's Services undocumented standard or opinion. Santa Cruz County Human Resources/Family and Children's Services standard is a subjective opinion and not a fact.

I know that my service and parenting of my seven children is of the best possible standard deliverable. I have the right to have a contrary standard or opinion which differs from Santa Cruz County Human Resources/Family and Children's Services as a 1st Amendment U.S. Constitutional right which I am entitled to.

To allow my re-education through the prescribed 18 month process set forth by Santa Cruz County Human Resources/Family Children's Service would effectively eliminate my true ability to deliver free speech. Santa Cruz County Human Resources/Family Children's Service wishes to create a "stepford" parental society to their subjective standard which is in violation of my 1st Amendment U.S. Constitutional rights.

**TENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR VIOLATION OF PLAINTIFF'S FEDERAL CIVIL RIGHTS PURSUANT TO (42.U.S.C.§ 1983) WELFARE AND INSTITUTIONS CODE §§ 300 (b) & (c) ARE UNCONSTITUTIONAL AND ARE VAGUE ON THEIR FACE**

Plaintiff realleges all paragraphs set forth above and incorporates them by reference as though they were fully set forth in this cause of action.

From March 24, 2015 and continuing to the present, Defendants, and each of them, have engaged in and continue to engage in, aided and abetted and continue to aid and abet, and conspired to and continue to conspire to engage in acts or practices that constitute violations of Plaintiff's Federal Civil Rights pursuant to 42 U.S.C. §1983.

The Welfare and Institutions Code §§ 300 (b) & (c) states no clear standard by which one could possibly comply. This allows the prosecution to come up with any series of events and call it criminal leaving a defendant unable to defend herself/himself from the allegations as there is no method to comply with the law. The term "adequate" is commonly used in WIC §§ 300 (b) and is highly debatable, vague and ambiguous as to its meaning. The law as stated has many equally debatable meanings and no defined standard by which to comply. You could be an angel and still be held in violation of this law. Welfare and Institutions Code §§ 300 (b) & (c) is a vague catch all law.

The Welfare and Institutions Code § 300 (c) is also extremely vague on its face. The subject law determines a person's guilt if the child exhibits medical conditions of serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others. These are medical conditions that any person can exhibit who becomes mentally ill or, in my daughter's Sun Shine Popovich's case, broke up with her high school boyfriend which caused severe emotional trauma through no fault of mine. These medical conditions are debatable as to their cause and are not specific to parental abuse or neglect.

Welfare and Institutions Code §§ (b) and (c) is primarily enforced on assumption and not a factual basis.

Social Worker, Amber Munoz, on May 22, 2015 informed me that in her two years with

-17-

Santa Cruz County Human Resources/ Family and Children's Services they have never lost a single case that has been brought before the Juvenile Dependency court in Santa Cruz County and that I should again submit to the allegation by signing some documents agreeing to attend the re-education program before the trial occurs. The idea of a 100% conviction rate is terrifying to me and I strongly believe that if I were to be brought before the Juvenile Dependency Court I have no chance of winning, not due to the facts of the case but rather due to Defendants' process of deprivation of Constitutional rights; again I have no doubt they will prevail. It is this fact that brings me to this Federal Court seeking redress and a request to this court for relief and for a permanent injunction to protect my family from these predators.

## ELEVENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiff realleges all paragraphs set forth above and incorporates them by reference as though they were fully set forth in this cause of action.

From March 24, 2015 and continuing to the present, Defendants, and each of them, have engaged in and continue to engage in, aided and abetted and continue to aid and abet, and conspired to and continue to conspire to engage in acts or practices that cause an infliction of emotional distress.

Throughout these proceedings the Defendants' conduct has been malicious and oppressive and has been intended to cause injury if not carried out with deliberate indifference to and callous disregard of Plaintiff's rights and well-being, justifying an award of punitive damages as to individual defendants.

I am 8 months pregnant, I am extremely vulnerable and I have been deemed a high risk pregnancy by my doctor and yet the all defendants have continued to attack and accuse me and violate my constitutional rights placing me in a situations that are extremely stressful. Defendants actions of isolating me in court rooms and offices for the purposed of persecution and interrogation without any representation even when I ask for my attorney or a family member to be with me are mostly denied. I am due to have a baby in the month of July, 2015. A motion for medical leave may be required during these proceedings.

-18-

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully request that the Court enter judgment in favor of the Plaintiff and against Defendants, jointly and severally, as follows:

That the court make such orders or judgments as may be necessary , including preliminary injunctive and ancillary relief.

For a permanent and preliminary injunction enjoining State of California, Santa Cruz County Human Services Department/Family and Children's Services Division, County of Santa Cruz, Carolyn Sprague, Amber Munoz, Shannon Sullivan, Evgenia Vatchkova, and Superior Court Judge Denine Guy, from any deprivation of my constitutional rights granted under the 1st Amendment, 5th Amendment, 6th Amendment and 14th Amendment of the U.S. Constitution.

For a permanent and preliminary injunction enjoining State of California, Santa Cruz County Human Services Department/Family and Children's Services Division, County of Santa Cruz, Carolyn Sprague, Amber Munoz, Shannon Sullivan, Evgenia Vatchkova, and Superior Court Judge Denine Guy from performing any closed judicial hearings which are not of the public forum.

For a permanent and preliminary injunction enjoining State of California, Santa Cruz County Human Services Department/Family and Children's Services Division, County of Santa Cruz, Carolyn Sprague, Amber Munoz, Shannon Sullivan, Evgenia Vatchkova, and Superior Court Judge Denine Guy from prosecuting me without a jury trial.

For a permanent and preliminary injunction enjoining State of California, Santa Cruz County Human Services Department/Family and Children's Services Division, County of Santa Cruz, Carolyn Sprague, Amber Munoz, Shannon Sullivan, Evgenia Vatchkova, Superior Court Judge Denine Guy from using hearsay evidence during trial.

For a permanent and preliminary injunction enjoining State of California, Santa Cruz County Human Services Department/Family and Children's Services Division, County of Santa Cruz, Carolyn Sprague, Amber Munoz, Shannon Sullivan, Evgenia Vatchkova, and Superior

Court Judge Denine Guy from using unqualified experts in delivering expert testimony.

For a permanent and preliminary injunction enjoining State of California, Santa Cruz County Human Services Department/Family and Children's Services Division, County of Santa Cruz, Carolyn Sprague, Amber Munoz, Shannon Sullivan, Evgenia Vatchkova, and Superior Court Judge Denine Guy from finding me guilty upon the onset of judicial proceedings.

For a permanent and preliminary injunction enjoining State of California, Santa Cruz County Human Services Department/Family and Children's Services Division, County of Santa Cruz, Carolyn Sprague, Amber Munoz, Shannon Sullivan, Evgenia Vatchkova, and Superior Court Judge Denine Guy from using un-timely court hearing dates and un-timely filed reports for the purpose of detaining my children or the purpose of prosecution.

For a permanent and preliminary injunction enjoining State of California, Santa Cruz County Human Services Department /Family and Children's Services Division, County of Santa Cruz, Carolyn Sprague, Amber Munoz, Shannon Sullivan, Evgenia Vatchkova, and Superior Court Judge Denine Guy from forced re-education through any method, program or ideology.

For a permanent and preliminary injunction enjoining State of California, Santa Cruz County Human Services Department/Family and Children's Services Division, County of Santa Cruz, Carolyn Sprague, Amber Munoz, Shannon Sullivan, Evgenia Vatchkova, and Superior Court Judge Denine Guy from prosecuting me using vague and ambiguous laws under WIC § 300.

For a permanent and preliminary injunction enjoining State of California, Santa Cruz County Human Services Department/Family and Children's Services Division, County of Santa Cruz, Carolyn Sprague, Amber Munoz, Shannon Sullivan, Evgenia Vatchkova, and Superior Court Judge Denine Guy from treating me and people in my class in differently from other persons being charges with crimes.

Throughout these proceedings the Defendants' conduct has been malicious and oppressive and has been intended to cause injury if not carried out with deliberate indifference to

and callous disregard of Plaintiff's rights and well-being, justifying an award of punitive damages as to individual defendants.

Plaintiff requests compensatory damages.

Plaintiff requests general damages and special damages.

Plaintiff requests punitive damages as the court may see fit.

Plaintiff requests $20,000,000.00 inclusively.

Plaintiff requests all relief and remedies available to this court.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands jury trial in this action.

Date: June 2, 2015

Plaintiff in Pro Se
Katrina M. Petrini

# EXHIBIT A

Santa Cruz County Human Services Department /
Family & Children's Services
1400 Emeline Avenue
Santa Cruz, California 95060
Stephanie Vikati
Post Dispo Social Worker Supervisor
(831) 454-7549
In-box caseload SG10
Carolyn Sprague SN14
Investigations Social Worker
(831) 454-4181
DSS No. 0234445

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SANTA CRUZ
1 Second Street, Watsonville, California 95076

## JURISDICTION/ DISPOSITION REPORT

| **Hearing Date** | **Hearing Time** | **Dept./Room** | **Hearing Type/Subtype** |
|---|---|---|---|
| 04/29/2015 | 8:30am | A | Jurisdiction/Disposition |

## IN THE MATTER OF

| **Name** | **Date of Birth** | **Age** | **Sex** | **Court Number** |
|---|---|---|---|---|
| Sun Shine Popovich | 01/26/1998 | 17 | F | DP003017 |

## RECOMMENDATION

The Department respectfully recommends that the Court take Jurisdiction of the minor, Sun Shine Popovich, under Welfare and Institutions Code 300 (b), (c) and (g), and that the child remain in out-of-home placement, and that her parents, Katrina and Shannon Popovich, receive family reunification services. Sun Shine, a child who has engaged in dangerous, risk-taking behaviors, is currently at a significant risk of abuse and neglect, due to the mother's continued emotional abuse of the child and failure to insure that Sun Shine receives adequate supervision, as well as the medical and mental health treatment that she needs. The minor is at further risk because of her father's absence. For many years Mr. Popovich has failed to provide regular care for his daughter and has done nothing to insure that she is protected from abuse and neglect while in the care of her mother.

## CHILD'S WHEREABOUTS

Sunshine is currently placed in a licensed group home facility in San Jose.

## PARENTS/LEGAL GUARDIANS

| Name/ Birthdate | Address/ Phone | Relationship/ To Whom |
|---|---|---|
| Katrina Popovich 10/16/1976 | 211 S. Navarra Dr. Scotts Valley, CA 95066 (831) 295-3101 | Mother/ Sunshine |
| Shannon Popovich 10/26/1972 | Last Known: 1116 Main Ave. Sacramento, CA 95835 (916)271-1546 | Father/ Sunshine |

## ATTORNEYS

| Name | Address/ Phone | Representing |
|---|---|---|
| Robert Patterson | 100 Doyle St. Suite A Santa Cruz, CA 95062 (831) 423-9644 | Sun Shine Popovich |
| Evguenia Vatchkova | 343 Soquel Ave. #149 Santa Cruz, CA 95062 (831) 998-7403 | Katrina Popovich |
| Sharon Carey-Stronck | 701 Ocean St. #505 Santa Cruz, CA 95060 (831) 454-2162 | Child Welfare Services |

## LEGAL HISTORY

**300 WIC Subsection(s)/Abuse Description**
(b), (c), (g)

| **Initial Removal** | **Initial Detention Order** | **Initial Jurisdiction Finding** |
| 3/20/15 | 3/25/15 | Present hearing |

| **Initial Disposition Order** | **Initial 364 FM Review** | **Second 364 FM Review** |
| Present hearing | | |

| **Initial 366.21(e) – 6 Month FR Review** | **Initial 366.21(f) – 12 Month FR Review** | **Initial 366.22 – 18 Month FR Review** |

| **Initial 366.25 – 24 Month/PP Review** | **Initial 366.3 PP Review** | **Initial NMD Review** |

| **FR Services Terminated** | **Non-Reunification Ordered** |

| **Initial Permanent Plan: Type/ Date Ordered** | **Current Permanent Plan: Type/ Date Ordered** |

## Additional Legal History

Non-applicable

## Prior Child Welfare History

**3/18/15:** A mandated reporter stated that on 3/17/15, Judge Morse remanded 17-year-old Sun Shine Popovich into the care of CPS during a Juvenile Probation hearing. Sun Shine was recently out with a friend at 2:30am and jumped into a car with a group of men who she had never met. The friend later said that she was drugged and raped, although Sun Shine denied being raped. Sun Shine's mother has no positive regard for her daughter and treats her with open contempt and distain. She has been unable or unwilling to provide the teenager with appropriate supervision, and recently refused to take her for medical treatment and refused to supply insurance info. when Sun Shine had a severe reaction to poison oak. The mother has also stated that she is not willing to transport her daughter to therapy or to participate in the WRAP program through probation. **This referral was investigated and allegations of general neglect of Sun Shine Popovich by her parents, Katrina and Shannon Popovich were substantiated. The child was placed in protective custody and a case was opened.**

**2/23/15:** A mandated reporter called to report the medical neglect of 17-year- old Sun Shine Popovich by her mother, Katrina Popovich. This morning, Sun Shine woke with a swollen eye due to a case of poison oak. The mother sent a text to the reporter, stating that she could not take Sun Shine to urgent care because she did not have enough time on the books to take time off work. The reporting party, along with a friend of Sun Shine, took her to the emergency room. The emergency room staff got permission from the mother by telephone to treat Sun Shine. The reporter stated that the mother said that she is tired of dealing with Sun Shine and that she doesn't want her daughter in her care. The parents do not allow Sun Shine to be at the house when they are not present. **This referral was investigated and an allegation of general neglect of Sun Shine Popovich by her mother, Katrina Popovich, was substantiated.**

1

2  **2/23/15:** A mandated reporter called to report the medical neglect of 17-year- old Sun Shine
3  Popovich by her mother, Katrina Popovich, and stepfather, Bunker Rogge. This morning, the
reporting party learned that Sun Shine was in the Dominican Emergency Department being treated
4  for poison oak. Sun Shine reported that when she awoke this morning, the right side of her face was
swollen, including her lip and eye area. This morning, Sun Shine asked her stepfather for help in
5  getting treatment but he refused to help her, telling her to take a cold shower. Sunshine called her
mother, who was staying at the grandmother's home because of verbal altercations with the
6  stepfather. Sun Shine said that her mother told her she couldn't help her because she had to go to
7  work. The mother told Sun Shine to go to school or find someone else to take her to urgent care. Sun
Shine was able to get a ride from a friend to Dominican. The mother gave permission for medical
8  treatment by telephone. Sun Shine will return to her friend's home after treatment, because her
parents do not want her in at the house when they are not present. The parents will not provide Sun
9  Shine with a key to the house. **This referral was taken as a secondary report.**

10  **2/24/15:** The reporting party emailed pictures and provided more information regarding the above
concerns.  The following is what the reporter stated: Attached are the pictures of Sun's eye. The
11  pictures are dated, as I took them yesterday and today. Sun Shine's mother called this morning and
was angry that Sun was refusing to leave the house. The mother felt that Sun should either go to
12  school or sleep on a couch in the backyard. She then threatened to "call the cops" and have them
13  remove Sun from her home. It should be noted that while the mother is insisting Sun is just being
difficult, she has yet to see her daughter's face, despite being told how bad it is. The mother feels that
14  Sun is only getting "what she deserves." **This referral was taken as a secondary report.**

15  **12/22/14:** A mandated reporter called via the Parent's Center Hotline to report concerns about the
16  general neglect of Sun Shine by her mother, Katrina Popovich. RP said that Sun Shine was taken to
the emergency room on Friday, 12/19/14, after being unresponsive after taking some vodka shots.
17  Sun Shine was evaluated and taken into a 5150 hold.  The reporter was concerned that the mother had
not responded to telephone calls after her daughter was taken to the Behavioral Health Unit.
18  Eventually, the mother was reached by telephone and made comments that her daughter was just
abusing the system and wanted attention.  Ms. Popovich arrived at the hospital and Sun Shine was
19  released to her with a safety plan and a referral made to Children's Mental Health Services. A
Suspected Child Abuse form was faxed in with the following additional information:  Sun Shine is
20  unsupervised for long periods of time, on Sunday from 11-2:30 p.m. and on Monday, Wednesday
21  Friday and Saturday mornings until 6-7pm in the evenings. There are concerns about the lack of
supervision, particularly due to the child's mental health symptoms. **This referral was investigated**
22  **and an allegation of general neglect of Sun Shine Popovich by her mother, Katrina Popovich**
**was substantiated.**
23

24  **4/23/14:** A mandated reporter called to report concerns about the general neglect of Sun Shine
Popovich by her mother, Katrina Popovich.  The mother told the reporter that Sun Shine has been out
25  of the home since January.  According to Ms. Popovich, her daughter has been staying with different
friends and refuses to come home.  The reporter spoke with Sun Shine today and the teenager said
26  that her mother kicked her out of the home on her birthday, 1/28/14.  Sun Shine said that since then,
she has been staying with friends and going to school.  The teenager said that her mother is mean and
27  doesn't want her in the home.  RP is concerned that the mother has not tried to do anything to get her
daughter back home and has not made a proper and safe plan for her child.
28

The reporter requested that a social worker interview Sun Shine at school in order to figure out whether the problem could be resolved without having to place Sunshine in protective custody. The reporter said that the social worker could call for assistance regarding a 300, if necessary. The Child Protective Services screener spoke with the mother, Katrina Popovich, who said that she was very frustrated with her daughter. Ms. Popovich said that she wanted to give up her parental rights because she didn't want to be legally liable for anything that Sun Shine might do. The mother said that Sun Shine is currently using drugs and alcohol and only goes to school because that is where she gets her drugs. The mother said that Sun Shine is not willing to get any help for her drug and alcohol issues and doesn't want any counseling. Ms. Popovich said that her daughter doesn't want to follow her house rules and that is why she has been a runaway since January. People have been telling Ms. Popovich that Sun Shine looks terrible and has been seen on the streets late at night. The mother said that she has reported Sun Shine missing but law enforcement won't do anything because her daughter will just run away again if the police take her home. Ms. Popovich says that there is no one in her family willing to take Sun Shine and that her father is not involved and also has drug issues. Ms. Popovich would like the county to take Sunshine into protective custody because she feels that she can't control her daughter's behavior. This screener explained the legal ramifications of abandonment of her daughter and the mother said that she didn't care at this point. **This referral was investigated and an allegation of general neglect of Sun Shine Popovich by her mother, Katrina Popovich was substantiated. The referral was closed and the family referred for counseling.**

**10/17/07:** A mandated reporter forwarded a written report of 243 (E) PC; Battery on Spouse or Cohabitant;Misd, 273 D (A) PC; Inflict injury upon a child; Felony, 273.5 (A) PC;Inflict Corporal Injury on Spouse/Cohabitant; Felony, and 273A(B); Willful Cruelty to Child; Misd. The mother, Katrina Popovich and her husband, Bunker Blues-William Rogge were in a domestic violence incident on 10/13/07 with minor, Summer, present during the violence. The mother kicked in the bedroom door because the stepfather had locked her out. The stepfather grabbed the mother by the throat and held her on the bed. He then grabbed Summer by the throat and pushed her into her room. Summer feared that he was going to seriously hurt her. Summer had red marks on both sides of her neck and a red mark below her right eye. The mother declined an emergency protective order. **This referral was investigated and an allegation of physical abuse of Summer Popovich by her stepfather, Bunker Rogge, was determined to be inconclusive. An allegation of at risk, sibling abused, involving Sun Shine Popovich, and her stepfather, Bunker Rogge, was also determined to be inconclusive. Allegations of the substantial risk of emotional abuse of Sun Shine Popovich by her mother, Katrina Popovich, and stepfather, Bunker Rogge, were substantiated. The referral was closed and the family was referred for counseling services.**

**7/6/99:** A mandated reporter stated that police responded to a domestic violence incident. The parents had gotten into an argument with a baby present. During the incident, several items were broken and there was broken glass all over the floor; enough glass that the father cut himself cleaning it up. **This referral was investigated and allegations of the emotional abuse of Sun Shine Popovich by her parents, Shannon and Katrina Popovich, were determined to be unfounded.**

## CRIMINAL HISTORY

The mother, Katrina Popovich, has no recorded criminal history.

The father, Shannon Popovich, has an extensive criminal record that includes numerous drug-related arrests and convictions, including at least one felony conviction. His last recorded arrest occurred on 10/28/14, when Mr. Popovich was arrested for being under the influence of a controlled substance.

## PATERNITY/LEGAL RELATIONSHIPS

At the detention hearing on 3/25/15, the Court found that the parents of the minor were married at the time of the child's birth and determined that Shannon Popovich is the presumed parent of the minor.

## FAMILY LAW STATUS

Although the undersigned located a child support case on the Superior Court website, there was no dissolution case found that indicated the legal and physical custody of the minor. The mother has stated, however, that she has full physical and legal custody of her daughter.

## ABSENT PARENT SEARCH

An absent parent search was requested on 3/19/15 and has been conducted by Social Worker Betty Puterbaugh-Clay. Ms. Puterbaugh-Clay located more than one telephone number and address for Mr. Popovich. The undersigned has made several attempts to reach the father, leaving numerous messages at the cell numbers provided, but as of yet, Mr. Popovich has not responded. Notice of the Jurisdictional/Dispositional hearing has been sent to the father at three separate addresses.

## INDIAN CHILD WELFARE ACT STATUS

The Indian Child Welfare Act may apply. The mother was asked on 3/19/15 if she had Indian Heritage, and she stated that her family has Native heritage but she had no information to indicate whether Sun Shine meets the requirements for tribal membership.

To clarify the ICWA status of the minor, the Reporting Social Worker, Laura McClain, is in the process of noticing the appropriate tribes.

## JURISDICTION

### Allegation(s) and Supporting Evidence

**b-1** The mother, Katrina Popovich's failure or inability to supervise and protect the minor Sun Shine Popovich adequately has placed the minor at significant risk of harm and neglect. On March 20, 2015, Judge Morse remanded Sun Shine into the care of Family and Children's Services because Ms. Popovich has been unable or unwilling to provide the minor with appropriate supervision. Sun Shine is not welcomed in her home and Ms. Popovich does not allow her daughter to stay in the home while she is at work. Ms. Popovich has stated that she is tired of dealing with Sun Shine and that she does not want her daughter in her care. Ms Popovich's inability or unwillingness to supervise or care for the minor leaves Sun Shine at risk of further risk of neglect and harm.

**b-2** The mother, Katrina Popovich's failure and/or inability to supervise or protect the minor, Sun Shine Popovich adequately has placed the minor at significant risk of harm and neglect. Ms. Popovich has failed to provide safe and consistent supervision of Sun Shine, resulting in the minor engaging in high risk behaviors. In April 2014, the minor had been out of the family home since January 2014; Ms. Popovich did not make a missing person's report for two weeks nor did she make a safety plan so that Sun Shine's basic needs could be met. At that time, Ms. Popovich told the Department that she would like to give up her parental rights so that she would not be legally liable for her daughter's actions. Around January 2015, Sun Shine was shot in the back while she was drinking in a car down town. In March 2015, Sun Shine spent the night in Watsonville with a group of men that gave her a ride and Ms. Popovich's response upon learning what happened was, "She's probably into that shit." Santa Cruz Police Report number 15S-02206 is attached and considered a part of this petition.

**b-3** The mother, Katrina Popovich's failure and/or unwillingness to provide the minor, Sun Shine Popovich with adequate medical treatment places the minor at significant risk of harm. In February 2015, Ms. Popovich was unwilling to leave work to take Sun Shine to the doctor to treat a severe case of poison oak that was on her face and eyes. Ms. Popovich's is not willing to take time off of work because Sun Shine brings "all kind of diseases home with her". Ms. Popovich's lack of willingness to respond to Sun Shine's medical needs places the minor at risk of serious illness or harm. Pictures of the minor's poison oak is attached and considered a part of this petition.

In April of 2014, the Department received a report regarding concerns about the general neglect of 16-year-old Sun Shine Popovich. A mandated reporter called, stating that Sun Shine had been out of her home for the past three months. The reporting party had met with Sun Shine and was told that she was kicked out of the home on her birthday (1/28/14) and had been staying with friends since then. Sun Shine told the reporter that her mother was "mean" and that she did not want her in the home.

The reporting party expressed concern that Sun Shine's mother, Katrina Popovich, had not tried to do anything to get her daughter to return and had not made an appropriate plan for the teenager. The Child Protective Services creener spoke with the mother, who said that she said that she wanted to give up her parental rights, as she didn't want to be liable for anything that Sunshine might do illegally. Ms. Popovich said that her daughter was using drugs and alcohol and only went to school in order to obtain drugs. She further stated that Sun Shine didn't want to follow her house rules, which is why she had been a runaway for several months. The mother said that she wanted the county to take her daughter into protective custody because she could not control Sun Shine's behavior. The screener explained the legal ramifications of abandoning her daughter but Ms. Popovich said she didn't care at that point. **Please refer to Attachment #1: Investigation Narrative, referral dated 4/23/14.**

The report was assigned for investigation and on 4/24/14, Social Worker Josephina Duran met with 16-year-old Sun Shine at Scotts Valley High, where she was attending school at the time. Sun Shine told the social worker that on 1/25/14, she and her mom began arguing, though she couldn't remember the details, and her mother told her to "get out". She said that the following morning she packed her stuff while the rest of her family went to church. Sun Shine said that she was willing to return home if her mother wanted her to.

After meeting with Sun Shine, Social Worker Duran met with her mother, Katrina Popovich. The social worker asked Ms. Popovich about the events that lead to Sun Shine's departure. The mother reported that on January 26, 2014, Sun Shine asked to spend the night at her friend's house and was given permission to do so. Ms. Popovich said that when Sun Shine returned to the family's home on Saturday morning, she noticed that she had a hookah in her purse. The mother said that she became upset and began searching her daughter's purse. Sun Shine was angry and the two became engaged in a verbal altercation. Ms. Popovich said that her daughter called her "a fuckin bitch" and the two argued for a bit before Sun Shine left to go her room. **Please refer to Attachment #1: Investigation Narrative, referral dated 4/23/14.**

The mother said when the family was getting ready for church the next morning, she observed Sunshine packing her personal belongings. When asked what she was doing, her daughter did not respond. Ms. Popovich said that her husband, Sun Shine's stepfather, asked her not to leave the family home. She said that when they returned home from church, Sun Shine was not there. Although the social worker informed the mother that the Child Protective Services report indicated that she was the one to ask Sun Shine to leave, Ms. Popovich denied the allegations. When asked if she had called the police and filed a missing persons report, the mother said that she hadn't. Social Worker Duran asked Ms. Popovich why she hadn't filed a report, to which she responded, "I thought she was coming back". The mother said that two weeks after Sun Shine left the home she filed a police report. She said that the police located her daughter at her friend, Isabella's, house but didn't bring her back home. When asked if she had contacted Isabella's mother to make plans for Sun Shine, Ms. Popovich stated, "I tried to call Jennifer but we played phone tag". The social worker asked the mother if she knew how things were going for her daughter and she responded, "I talked to Sunshine here and there". **Please refer to Attachment #1: Investigation Narrative, referral dated 4/23/14.**

Social Worker Duran talked with the mother about her legal obligation to insure the safety and well being of her daughter, and to make sure that her needs for food clothing, shelter, supervision and medical care were being met. The social worker explained that even if Sun Shine was not staying at home, it was still her responsibility to insure that someone was providing for her daughter. The mother then became upset and stated that Sun Shine had been abusive toward her and she feared that she might hurt her. The social worker informed the mother that while her concerns might be valid, they did not eliminate the need to make appropriate arrangements for her daughter.

Ms. Popovich became increasingly agitated and said that she wanted to file a police report on her behalf since she was the victim of elder abuse by her daughter. **Please refer to Attachment #1: Investigation Narrative, referral dated 4/23/14.**

The social worker talked with the mother about her options, explaining that she could either bring Sun Shine home and access support services, or could make arrangements for a relative or family friend to care for the child. Ms. Popovich said that she wanted to go for "option number three", which she said involved Sergeant Ball, a police officer at the Scotts Valley Police Department, placing her daughter on a 601 PC and taking her to Juvenile Hall. The mother insisted that the officer was planning on placing the child at the hall the following Monday, on 4/28/14.

On 4/28/14, Social Worker Duran spoke to Sergeant Ball about the family's situation and the mother's statement that he was planning on placing the minor at Juvenile Hall. Sergeant Ball denied having any knowledge of a possible 610 PC and said that he would be meeting with Ms. Popovich and Sun Shine that afternoon to attempt to mediate an agreement between them. Sergeant Ball called the Department that evening and spoke with an after-hours social worker. He stated that Ms. Popovich was no longer willing to allow her daughter to stay with the friend that she had been staying with, but was not willing to allow her to return home either. Sergeant Ball said that the mother had contacted the police department numerous times, stating that she was scared of her daughter and wanted her placed on a 5150 hold or placed in foster care. The police officer stated that he felt that the mother could care for her daughter but was choosing not to, or trying to find reasons to avail herself of the responsibility. Sergeant Ball said that he would facilitate a plan of having Sun Shine return to her friend's home for the night. **Please refer to Attachment #1: Investigation Narrative, referral dated 4/23/14.**

The following day, 4/29/14, Social Worker Duran spoke with the mother again. Ms. Popovich said that Sunshine was not placed in Juvenile Hall by Sergeant Ball. She said that the day before, she met with Sergeant Ball, the high school principal, and Sun Shine at Scotts Valley High. The mother said that the meeting did not go as planned because Sun Shine refused to return home. The social worker told the mother that Sergeant Ball had reported that she was the one who didn't want her daughter home.

Ms. Popovich then stated that Sun Shine had expressed a desire to live with her father in Fremont. The social worker expressed concern about that possibility, given the father's history of substance abuse. The mother stated that she had no knowledge that Sun Shine's father was currently using, but in any case, would make a plan for her daughter to live with the paternal grandfather. Despite suggesting that plan, when Social Worker Duran spoke to Ms. Popovich the following day, she stated that Sun Shine had returned home and that she was happy to have her there. **Please refer to Attachment #1: Investigation Narrative, referral dated 4/23/14.**

On 5/8/14, the social worker submitted her Investigation Narrative report, indicating that the allegation of general neglect of Sun Shine by her mother was substantiated. Social Worker Duran made the determination on the basis that Sun Shine left the family home the Sunday following her 16th birthday but her mother did not file a missing person's report for two weeks. The social worker determined that Ms. Popovich failed to provide her daughter with her basic needs and did not make adequate arrangements for her care. Since Sun Shine had returned home, the referral was closed, with the recommendation that the family participate in counseling. **Please refer to Attachment #1: Investigation Narrative, referral dated 4/23/14.**

Several months after the 4/23/14 investigation, the Department received an additional report regarding allegations of neglect. On 12/22/14, a mandated reporter called, stating that 16-year-old Sun Shine Popovich had been hospitalized when she became unresponsive after consuming vodka. The reporting party expressed concerns about the mother's response to her daughter's hospitalization and the amount of supervision the child was receiving at home, given her mental health symptoms. The report was generated as a referral and assigned for a social worker to investigate. **Please refer to Attachment #2: Investigation Narrative, referrals dated 12/22/14, 2/23/15, and 3/18/15.**

On 12/29/14, the undersigned attempted an unannounced visit to the home, leaving a business card when no one came to the door. Following the visit, Ms. Popovich, left a voicemail message with the social worker stating, "Yeah, we work, and Sun Shine was supposed to be at my mother's house but she doesn't like to stay there so she just wanders around. I don't know, haven't really talked to her today. She doesn't call and does exactly what she wants. I know she does have court tomorrow and if she doesn't show, I guess they'll issue another bench warrant for her. So if you want to check in with her well being you should call her cell phone. Otherwise, we rarely see her. I've seen her once since Christmas, so that's just to let you know.  It's been several days; she's been staying elsewhere." **Please refer to Attachment #2: Investigation Narrative, referrals dated 12/22/14, 2/23/15, and 3/18/15.**

On 1/9/15, the social worker spoke with the mother directly over the telephone.  Ms. Popovich stated that her daughter was on probation due to a long list of crimes, including theft and fighting in public.  She said that Sun Shine had been wearing an electronic monitor but once it was taken off, she "fell off the wagon".  The mother said that her daughter "went out and got wasted" with some friends and after they couldn't rouse her, Sun Shine was hospitalized.  Ms. Popovich explained that initially refused to pick up her daughter from the hospital because she was worried that she would end up killing herself at home.  The mother said that she eventually picked up Sun Shine at the behavioral health unit and her daughter then resumed "running around".  Ms. Popovich said that Sun Shine was detained in Juvenile Hall for several days during the holidays and at the next probation hearing her daughter was ordered to be on house arrest with an ankle monitor.  The mother said that she was ordered to go to the conflict resolution center for mediation with Sun Shine and spent three hours at the center, but right after the mediation session she went out and "got wasted". **Please refer to Attachment #2: Investigation Narrative, referrals dated 12/22/14, 2/23/15, and 3/18/15.**

A few days later, on 1/13/15, the investigating social worker met with Ms. Popovich and 17-year-old Sun Shine at the Child Welfare Services office.  Both mother and daughter presented with a similar attitude, acting somewhat condescending, dismissive and disrespectful toward the social worker.  Sun Shine did not want to discuss what led her to be put on probation or caused her to drink to the point of requiring hospitalization.  The teenager said that she had made some "bad decisions" and was working on doing better.  Sun Shine said that she is working more than one job and when she was fired from one of her jobs because she was on probation, she was quick to find another one.  While the teenager talked about her efforts to succeed, her mother provided no support or encouragement, and admitted that she had no hope or belief in her daughter.  **Please refer to Attachment #2: Investigation Narrative, referrals dated 12/22/14, 2/23/15, and 3/18/15.**

Despite stating, "I won't take any abuse" Ms. Popovich said that she planned on having her daughter at home until she turned 18.  Both mother and daughter said they planned to continue to live together and would be "civil" until the teenager reached majority.  Despite their resolve, during the meeting Sun Shine and her mother argued about a recent incident whereupon both had thrown food at each other.   Although encouraged to participate in counseling, Ms. Popovich expressed no desire to do so.  She did agree to sign a safety plan, stating that she would provide 24 hour supervision for her daughter, which she referred to as "babysitting", and on the safety plan the investigator wrote, "Social worker strongly encourages the mother to pursue family or individual counseling".  **Please refer to Attachment #2: Investigation Narrative, referrals dated 12/22/15, 2/23/15, and 3/18/15.**

Although the mother had agreed to provide round the clock supervision of her daughter, less than two weeks later, on 1/25/15, Sun Shine was the victim of a gang related shooting that occurred after she and a friend went to downtown Santa Cruz and consumed alcohol together.  The teenager was grazed with a bullet but did not sustain a life threatening injury.  **Please Refer to Attachment #3: Juvenile Probation Court Report, Case #J23350.**

The month following Sun Shine's involvement in the shooting, the Department received two additional Child Protective Services reports. On 2/23/15, two different mandated reporters called regarding concerns about the neglect of Sun Shine, now 17. The reporters both stated that the teenager had a severe case of poison oak but the mother was not willing to take her for medical treatment. One of the reporters sent pictures of Sun Shine, which showed that the right side of the child's face was covered in poison oak and her eye was swollen completely shut. **Please refer to Attachment #4: Pictures of the minor's poison oak reaction, pages 1&2.**

The reports were assigned for investigation and on 3/2/15, the investigating social worker contacted Suzanne Reese, Sun Shine's probation officer at the Juvenile Probation Department. Ms. Reese said that Sun Shine developed a really bad case of poison oak but that her mother hadn't even seen it, and in fact, had refused to look at it. Ms. Reese said that Ms. Popovich sent her a text message stating that she was not willing to take time off work to take Sun Shine for medical treatment. The mother also said she was not willing to let her daughter stay home from school, as she didn't want her alone at the house. **Please refer to Attachment #5: Text message from Ms. Popovich to Sun Shine's probation officer.**

Ms. Reese said that after learning about Sun Shine's poison oak, she and Sun Shine's counselor went to the teenager's home to check on her. Sun Shine's grandfather was at the house and when he called her to come downstairs, seemed surprised to see how bad the teenager's face was. Ms. Reese said that she and Sun Shine's friend ended up arranging for her to be seen by a doctor and, that she, in fact, ended up paying for Sun's medications. The probation officer expressed frustration regarding the callous attitude the mother seemed to have about her daughter's condition. **Please refer to Attachments #6 and #7: Text messages from Ms. Popovich to Sun Shine's Probation Officer.**

After learning of the situation, on 3/3/15, the investigating social worker met with Sun Shine at the Child Welfare Services office. The teenager was asked about her mother's response to her poison oak condition. Sun Shine said that her mother refused to take her to the doctor and would not even send her a picture of her medical insurance card so that she could pay for the treatment. **Please refer to Attachment #2: Investigation Narrative, referrals Dated 12/22/14, 2/23/15, and 3/18/15.**

Two weeks later, on 3/18/15, the Department received an additional report involving additional allegations of neglect. The reporter stated that the teenager had recently been out with friends at 2:30 in the morning and she and a girlfriend jumped into a car with a group of men that she didn't know. Sun Shine's friend later told police that she had been drugged and raped by one of the men. The reporting party stated that at Sun Shine's probation hearing on 3/17/15, the judge determined that the child was not safe in the care of her mother and ordered her into the custody of Child Protective Services. **Please refer to Attachment #2: Investigation Narrative, referrals Dated 12/22/14, 2/23/15, and 3/18/15.**

After the referral was assigned for investigation, the undersigned went to Juvenile Hall to meet with the 17-year-old teenager and asked her about the recent incident involving the sexual assault. Sun Shine said that over the weekend she was out with friends, spending time on the West Side. She said that she and her friend, Jackie, were waiting for some other friends who had gone to fill up their car with gas. Sun Shine said that while they were waiting, a group of guys pulled up and asked them to go for a drive. She said that she recognized one of the people in the car. She and her friend went with the guys and eventually asked them to drop them off back at the West Side. Sun Shine said that the guys said they couldn't take them back, as they had to get back to Watsonville. She said that they convinced the guys to stop in Aptos on the way so that they could go to her friend, Jackie's, boyfriend's house. But when they got to Aptos they couldn't find the boyfriend's home. Sun Shine said they eventually went to Watsonville and spent the night at one of the guy's homes.

1

2  Sun Shine said that her friend, Jackie, passed out.  She said that she went into the bathroom for a few

3  minutes to wash off her make-up and when she returned, she found Jackie partially undressed on a

4  bed.  Sun Shine said that she started yelling at one of the guys, who insisted that it was no big deal,

5  they were just "hooking up".  Sun Shine said that she stayed awake the whole night and the next

6  morning she and her friend, Jackie left.  Sun Shine admitted to the social worker that she had not

7  been staying at her house. She said that she didn't go home on Friday and Saturday because her

8  mother was angry with her and had ripped apart her room, tore everything off of the walls and bagged

9  up all of her stuff.   **Please refer to Attachment #2: Investigation Narrative, referrals dated**

10 **12/14/14, 2/23/15, 3/18/15.**

11         The following day, 3/19/15, the investigating social worker met with the mother, Katrina

12 Popovich, to discuss the Court order that had placed Sun Shine in the custody of Child Protective

13 Services.  Ms. Popovich focused on her daughter's behavior and had great difficulty identifying any

14 concerns about her parenting.  She told the social worker that her daughter was shot in the back a

15 couple of months prior while in downtown Santa Cruz.  She said that at the time, one of her

16 telephones was confiscated by police and that approximately three weeks later she received a phone

17 call from a detective, who told her that he found "thousands" of photos on her daughter's cell phone

18 that were "pornographic".  The mother said that the pictures included photos of Sun Shine and her

19 friends with their clothes off and said the detective told her that Sun Shine had texted the photos to

20 other people.  Ms. Popovich said when she heard about the photos that Sun Shine had taken she was

21 "devastated", and seemed to be more focused on the pictures that were taken, than on the shooting

22 incident.  **Please refer to Attachment #2: Investigation Narrative, referrals Dated 12/22/14,**

23 **2/23/15, 3/18/15.**

24         Ms. Popovich went on to say that she thought Sun Shine's boyfriend, who had a cocaine

25 problem, had given her the idea to take the photos.  The mother said that she had also found texts on

26 Sun Shine's telephone that she thought were related to drug dealing and had found journals in her

27 daughter's bedroom where Sun Shine spoke about doing drugs and wanting to kill herself.

28

The mother said that the journals showed "intense sadness and depression and hormonal insanity". **Please refer to Attachment #2: Investigation Narrative, referrals Dated 12/22/14, 2/23/15, 3/18/15.**

Ms. Popovich talked about the history of her daughter's problematic behavior, stating that at the age of 12, she became aware that Sun Shine had "rage and anger issues". The mother said that Sun Shine once tried to bludgeon her over the head with a television when she was seven months pregnant with her younger daughter, has closed doors on her, and had grabbed her by the wrists. Ms. Popovich said that she recently was told by one of Sun Shine's aunts that her daughter used to beat up her older sister, Summer. "Now I know why my other daughter went to the East Coast and is never coming back", she stated. Ms. Popovich attributed her daughter's behavior to the abandonment by her father, stating that both she and her older sister took his leaving badly. Regarding his leaving, the mother stated, "I don't think Sun Shine is making it; I think it's devouring her.", and when speaking of her daughter's behavior, she stated, "It's not about me". **Please refer to Attachment #2: Investigation Narrative, referrals dated 12/22/14, 2/23/15, 3/18/15.**

During the March 19 meeting with Ms. Popovich, the social worker asked her about Sun Shine's recent bout of poison oak and why hadn't taken her for medical treatment. The mother admitted that she had never seen the poison oak and said that by the time her daughter decided to seek treatment, she was at work. Ms. Popovich said she couldn't help Sun Shine while she was at work and didn't have an insurance card with her. She said that the emergency room doctor called her and told her that Sun Shine had "classic case of poison oak" and that it was "not life threatening". The mother said that Sun Shine was not given any injections but was prescribed medication. She said that whatever Sun Shine needed could have been done for her when she got off work. Ms. Popovich seemed to attribute the poison oak to her daughter's bad behavior and stated, "I shouldn't have to quit my job to assist her in her illegal enterprises." **Please refer to Attachment #2: Investigation Narrative, referrals dated 12/22/14, 2/23/15, and 3/18/15, as well as Attachments #5, #6, #7: Text messages from Ms. Popovich to Sun Shine's probation officer.**

In addition to the discussion about Sun Shine's poison oak, the social worker asked the mother about the more recent incident in which Sun Shine's girlfriend was sexually assaulted. Ms. Popovich blamed the incident on Sun Shine, stating that she believed her daughter may have set up her friend to get raped. When the social worker questioned her about it, Ms. Popovich said that she based her belief on the fact that Sun Shine denied being victimized herself, and though the friend said she was drugged during the incident, Sun Shine only tested positive for marijuana afterward. The mother seemed to think her daughter may have set up the rape since she had sent nude pictures of her and her friends via texts in the past. **Please refer to Attachment #2: Investigation Narrative, referrals dated 12/22/14, 2/23/15, and 3/18/15.**

When the social worker spoke with Ms. Popovich on the 19th, explaining that the petition filed in Juvenile Dependency Court would include allegations of neglect, the mother adamantly denied neglecting her daughter in any way. She said that she thought Sun Shine belonged in the Juvenile Probation system and should spend more time in Juvenile Hall. "Four days is not enough", she stated, "I thought this weekend that they were going to find her dead in a slough". The mother went on to say, "Everything we try to build up, she tears down". When asked about prospective family members to be considered for placement, Ms. Popovich stated, "Her father "doesn't want her; he doesn't even take care of himself. No one in the family will take her. My parents are in their eighties; she'd kill them". **Please refer to Attachment #2: Investigation Narrative, referrals dated 12/22/14, 2/23/15, and 3/18/15.**

Several days after the meeting with Ms. Popovich, the social worker spoke with Sun Shine's probation officer, Suzanne Reese, in hopes of obtaining more information regarding Sun Shine and her family. During a telephone conversation on 3/23/15, Ms. Reese told the social worker that during Sun Shine's probation hearing, Judge Morse, and later, Judge Guy, ordered the child into the custody of Child Protective Services because the teenager wasn't really welcome as home and there was no parental supervision provided. She said that during the hearings the mother voiced no objection to Sun Shine being placed with Child Protective Services.

When asked about the reasons for Sun Shine's probation, Ms. Reese stated that she was on probation for public intoxication, possible drug overdose, and theft. She said that Sun Shine had texted "nudey pictures" on her telephone but no charges had been filed. The probation officer explained that the District Attorney had refused to file, stating that the pictures were not indicative of child pornography, but were of "kids taking selfies". Ms. Reese said that there was no evidence that Sun Shine had set her girlfriend up to get raped but that the mother seemed to believe that she was behind it. She further stated that the night that Sun Shine and her friend disappeared with the men in the car, Sun Shine's other friend, Peyton, went to her mother's house to alert her. Peyton said that when Ms. Popovich heard that Sun shine may have been kidnapped and raped, the mother stated, "She's probably into that shit" and slammed the door on the girl's faces. She said that after Sun Shine and her friend had gone missing with the men from Watsonville, the mother sent her a text stating, "These two junkies came to my house in the middle of the night and told me that Suns probably been kidnapped and raped." The probation officer said that even though Sun Shine was out on the town, she didn't think that the mother reported she was missing until law enforcement contacted her, which was three days after she had last seen the child. **Please refer to Attachment #2: Investigation Narrative, referrals dated 12/22/14, 2/23/15, and 3/18/15, as well as Attachment #8: Text messages from Ms. Popovich to the probation officer, pages 1 and 2.**

During the telephone conversation on March 23rd, the social worker asked Ms. Reese about the shooting incident that Sun Shine was involved in. The probation officer said that Sun Shine was sitting in a car drinking with a female friend when she was "grazed" in the back and her friend was shot in the arm and said she didn't think that Sun Shine was the intended target. Ms. Reese went on to express concern about the mother's response to the incident, stating that Ms. Popovich seemed more concerned that her daughter was intoxicated at the time, rather than with the fact that she could have been killed.

The probation officer further stated that the day after Sun Shine was shot, her mother was very angry because her daughter wasn't going to school, since the teenager had "only been grazed". **Please refer to Attachment #2: Investigation Narrative, referrals dated 12/22/14, 2/23/15 and 3/19/15.**

During the telephone contact with Ms. Reese, the social worker asked her about the mother's refusal to take her daughter for medical treatment. Ms. Reese stated that on 2/23/15, the mother sent her a text telling her that Sun Shine had poison oak and could not stay at the house while they were away. Ms. Reese said that the mother told her that she and the stepfather would no longer take work off because "Sun Shine brings all kind of diseases home with her." **Please refer to Attachment #2: Investigation Narrative, Referrals dated 12/22/14, 2/23/15, and 3/18/15, as well as Attachment #5: Text messages sent from Ms. Popovich to the probation officer.**

Following the conversation with Ms. Reese on 3/23/15, the social worker contacted Sun Shine's previous probation officer, Dan Cocherell, to ask him about his experience with the family. Mr. Cocherell reported that Ms. Popovich had "a major disconnect" and didn't seem to want any part of her daughter. He said that following the shooting, the mother appeared to be more concerned about getting her daughter tested for alcohol than for Sun Shine's actual well being. **Please refer to Attachment #2: Investigation Narrative, referrals dated 12/22/14, 2/23/15, and 3/18/15.**

In addition to the telephone conversations with Sun Shine's probation officers, the social worker reviewed a Court report from Deputy Probation Officer Suzanne Reese, dated 3/17/15. In the report Ms. Reese summarized Sun Shine's statements regarding the incident involving the rape of her girlfriend, as well as the mother's reactions to the incidents. The probation officer discussed the mother's anger at the juvenile justice system, which she said has "failed my daughter'. In her report, Ms. Reese stated that although Ms. Popovich expressed anger about not knowing her daughter's whereabouts, "She has a history of making Sun unwelcome in their home, going as far as to call the Scotts Valley Police to have her kicked out when she had poison oak on her face".

The probation officer concluded, "Ms. Popovich views detaining her daughter as helping her. This along with her unwillingness to work on building a relationship with Sun, and her continued refusal to participate in Wraparound, makes a difficult situation nearly impossible to navigate". **Please refer to Attachment #9: County of Santa Cruz Juvenile Case Referral dated 3/17/15.**

On 3/24/15, the social worker contacted Sun Shine's older sister, Summer Popovich. Ms. Popovich said she was aware that Sun Shine was in a group home placement and said she knew that Sun Shine wanted to go home but stated, "My mom does not care. There has been no caring for me and Sun Shine for a long time in the family." The social worker asked Ms. Popovich if she left the home because of problems with Sun Shine, as her mother had suggested. She stated, "Sun Shine was the only reason that I stayed". Ms. Popovich further stated, "My mom's crazy. I think she might have undiagnosed bipolar. She was on Prozac for two years and then completely dropped it cold turkey and since then, she's been like the devil". Ms. Popovich continued, "My mom has had disgust and hatred for Sun for a long time and when I left, it just got worse. It was not a good parent situation. She takes no responsibility. She wants Sun Shine out of the house for good".

On 4/16/15, the undersigned met with Ms. Popovich to discuss the allegations in the petition filed in Dependency Court, in preparation for the Jurisdictional/Dispositional report. The mother brought written responses to each of the allegations to the meeting which have been summarized and provided as attachments to this report. In response to the allegations in b-1, Ms. Popovich said that she could not control Sun Shine, as she refused to comply with even the "simplest rules" and said she thought the child "would be safer in the custody of someone more able to enforce rules of safety". Ms. Popovich said that during the three weeks prior to her daughter's removal the teenager "sat home every day" as her grandfather came to the house to "babysit" her. Ms. Popovich summarized numerous efforts that she had made to involve the police, but stated that law enforcement refused to force the teenager to come home and instead, "supported her delinquency" by allowing her to stay away from home. The mother went on to state that the Juvenile Probation Department had "failed to obtain Sun Shine's compliance to any rules which enables Sun Shine to disobey our house rules".

Ms. Popovich further stated, "Sun Shine has a home, bed and her own room waiting for her. She has food and clothing available to her still." **Please refer to Attachment #10: Mother's written response to the allegations in b-1.**

With regards to her response to the allegations in b-2, Ms. Popovich stated that Sun Shine refused to come home after leaving the house on her birthday and that she "solicited several agencies to assist me in getting her to come home". Ms. Popovich detailed several calls that she made to the Scotts Valley Police Department and to the high school, as well as a letter she sent to the Human Services Department, in an effort to obtain assistance with her daughter.

The mother stated that the day that Sun Shine was "shot in the back" she sent several texts to her telling her that she needed to be home by 4:00pm. She said that when Sun Shine complained that it was the weekend, she decided to let her stay out until 6:00pm. Ms. Popovich said that Sun Shine didn't' come home and "instead got shot in the back". She said that she went to the emergency room at Dominican Hospital with her daughter afterword.

Ms. Popovich further stated that when Sun Shine spent the night with the men in Watsonville, she was to be home at 10:00pm on March 15th. She said that she received a call from the police stating that they were looking for her daughter and that Sun Shine's friends came to the home at 12:30am the following morning. Ms. Popovich said that she filed a missing persons report and that her daughter did not return home until the 16th, when the Scotts Valley Police located her having a coffee at Starbucks "like nothing had happened". **Please refer to Attachment #11: Mother's response to the allegations in b-2, pages 1&2.**

In the mother's written response to b-3, she referenced medical records as well as a list of mental health providers that have reportedly worked with Sun Shine over a span of several years. Ms. Popovich also summarized the poison oak incident, stating that Sun Shine reportedly contracted the poison oak on a Friday night but did not come home all weekend until late Sunday night, and did not report any health issues to her mother. Ms. Popovich stated that on Monday morning Sun Shine woke up too late to go to school when her mother was already at work.

The stepfather reportedly saw Sun Shine's case of poison oak and told the mother that she had "a life threatening" (meant to be non-life threatening?) "common case of poison oak", like ones that he had at least 3xs before in his life, and  that "he lived".    According to Ms. Popovich, her husband also told her that it was "extremely uncomfortable and looked terrible".   She wrote that "Sun Shine made her way" to the ER, and that she authorized medical treatment over the phone.   Ms. Popovich further stated that if Sun Shine had stayed home "we would have purchased OTC pink topical ointment and Benadryl".   **Please refer to Attachment #12: Mother's written response to b-3.**

The undersigned made several efforts to contact the father, Shannon Popovich, to discuss the allegations in the petition and notify him of the upcoming hearings.   Messages were left at two different telephone numbers on 3/24/15 and at three different telephone numbers on 4/15/15. Although his eldest daughter, Summer, stated that Mr. Popovich was aware that Sun Shine had been removed from her mother, and that she had given him the telephone number of the social worker, the father has yet to make any contact with the Department.

**b-4  The father, Shannon Popovich's failure or unwillingness to supervise or protect the minor, Sun Shine Popovich, adequately from the conduct of the mother, Katrina Popovich,  with whom she has left. Mr. Popovich's failure to intervene and protect his daughter.**

**b-5  The father, Shannon Popovich's substance abuse negatively impacts his ability to provide regular and appropriate care for the minor, Sun Shine Popovich, and places her at substantial risk of harm and neglect. Mr. Popovich was convicted of possession of a controlled substance twice in 2010, twice in 2014 as a misdemeanor and a third time in 2014 as a felony.  Mr. Popovich's drug use and subsequent incarceration negatively impacted his ability to care for and protect his daughter.**

Since the father's whereabouts are currently unknown and efforts to contact him have been unsuccessful, the evidence in support of b-4 and b-5 has been collected from other sources.  A review of the father's criminal record reveals several drug-related arrests that have occurred during the last 20 years.  In 1994, Mr. Popovich was arrested for possession of a controlled substance and for battery and received a misdemeanor conviction, diversion and 30 days jail, as well as 3 years of probation. In 1997, Mr. Popovich was arrested on a domestic violence charge that was later dismissed.

In 2009, Mr. Popovich was arrested for possession of a narcotic controlled substance, for possession of controlled substance paraphernalia, and for selling hypodermic needle/syringe without a permit. He later received a misdemeanor conviction for possession of a controlled substance and was sentenced to enter a drug treatment program. In July of 2010, Mr. Popovich was arrested for possession of a controlled substance, for which he later received a misdemeanor conviction and was sentenced to 60 days jail and 3 years of probation. In August of 2010, he was again arrested for possession of a narcotic controlled substance, for which the disposition is unknown.

In 2014, Mr. Popovich received several more arrests. He was arrested on three different occasions for use/being under the influence of a controlled substance, and once for possession of a narcotic controlled substance and for possession of drug paraphernalia. He received both a misdemeanor and felony conviction that year and was sentenced to 6 days in jail and 5 years of probation.

On 3/24/15, the social worker spoke with Sun Shine's older sister, Summer Popovich, about the father. Ms. Popovich reported that although her father had drug history, she believed he had been clean for the last four months and was living in an SLE. On 4/15/15, when the social worker spoke with her again, Ms. Popovich reported that she thought her father had relapsed and had left the SLE, and said she didn't know where he was currently living.

On 4/16/15, the undersigned met with the mother and talked with her regarding the allegations in b-4 and b-5. Ms. Popovich said that she and Mr. Popovich separated when Sun Shine was a baby because the father was violent and was a drug addict. She stated that after the divorce, the father was initially only allowed supervised visits and saw Sun Shine and her sister every few weeks. When asked for details, the mother stated, "I remember more times of him being absent than being there." Ms. Popovich stated that the father "disappeared" for quite a while but when Sun Shine was in the 5th or 6th grade she went to live with him for about two months, after the father had been clean for a couple of years.

The mother said that Mr. Popovich then ended up relapsing and lost his apartment. She said that when Sun Shine was in Junior High and in High School, she went for visits with the paternal grandmother, and the father was sometimes included. In recent years, Sun Shine has had no contact with her father. Ms. Popovich said that Mr. Popovich has paid child support sporadically through his benefits but currently owes her $120,000.00 in child support.

**c-1 The mother, Katrina Popovich's inability and/or willingness to provide appropriate care of the minor, Sun Shine Popovich places the minor at substantial risk of suffering serious emotional damage. On December 22, 2014, Sun Shine was taken to the emergency room after being unresponsive from taking vodka shots. Sun Shine was placed on a 5150 hold and later released to Ms. Popovich's care with a referral for Children's Mental Health. In January 2015, Ms. Popovich initially refused to pick up Sun Shine from the Dominican Hospital Emergency Room after her daughter "got wasted" and was hospitalized. Ms. Popovich was too worried about her daughter killing herself at home. Ms. Popovich has not been willing to transport her daughter to therapy or to participate in the WRAP program as recommended through Juvenile Probation.**

**c-2 The mother, Katrina Popovich's conduct places the minor at substantial risk of suffering serious emotional damage. Ms. Popovich refers to her daughter as "a whore, slut, bitch, bum, drug addict pathological liar and sociopath". Ms. Popovich's words place the minor at significant risk of emotional damage because of their negative psychological effect. Sun Shine suffers from suicidal ideation, depression and substance abuse.**

As stated earlier, on 12/22/14, the Department received a call from a mandated reporter, stating that 16-year-old Sun Shine Popovich had been hospitalized when she became unresponsive after consuming vodka. The reporting party expressed concerns about the mother's response to her daughter's hospitalization and the amount of supervision the child was receiving at home, given her mental health symptoms. **Please refer to Attachment #2: Investigation Narrative, Referrals dated 12/22/14, 2/23/15, and 3/18/15.**

A week after the Department received the report that Sun Shine was hospitalized due to an overdose, the investigating social worker received a voicemail message from the mother stating, "Yeah, we work, and Sunshine was supposed to be at my mother's house but she doesn't like to stay there so she just wanders around. I don't know, haven't really talked to her today.

1

2  She doesn't call and does exactly what she wants. I know she does have court tomorrow and if she

3  doesn't show, I guess they'll issue another bench warrant for her. So if you want to check in with her

4  well being you should call her cell phone. Otherwise, we rarely see her. I've seen her once since

5  Christmas, so that's just to let you know. It's been several days; she's been staying elsewhere."

6  **Please refer to Attachment #2: Investigation Narrative, Referrals dated 12/22/14, 2/23/15, and**

7  **3/18/15.**

8  On 1/9/15, the social worker spoke with the mother directly over the telephone. Ms.

9  Popovich stated that her daughter "went out and got wasted" with some friends and after they

10  couldn't rouse her, Sun Shine was hospitalized. Ms. Popovich explained that she initially refused to

11  pick up her daughter from the hospital because she was worried that she would end up killing herself

12  at home. The mother said that she eventually picked up Sun Shine at the behavioral health unit and

13  her daughter then resumed "running around". Ms. Popovich said that Sun Shine was detained in

14  Juvenile Hall for several days during the holidays and at the next probation hearing her daughter was

15  ordered to be on house arrest with an ankle monitor. The mother said that she was ordered to go to

16  the conflict resolution center for mediation with Sun Shine and spent three hours at the center, but

17  right after the mediation session she went out and "got wasted". **Please refer to Attachment #2:**

18  **Investigation Narrative, referrals dated 12/22/14, 2/23/15, and 3/18/15.**

19  A few days later, on 1/13/15, the investigating social worker met with Ms. Popovich and 17-

20  year-old Sun Shine at the CWS office. Sun Shine did not want to discuss what led her to be put on

21  probation or caused her to drink to the point of requiring hospitalization. The teenager said that she

22  had made some "bad decisions" and was working on doing better. Sun Shine said that she is working

23  more than one job and when she was fired from one of her jobs because she was on probation, she

24  was quick to find another one. While the teenager talked about her efforts to succeed, her mother

25  provided no support or encouragement, and admitted that she had no hope or belief in her daughter.

26  Although encouraged to participate in counseling, Ms. Popovich expressed no desire to do so. **Please**

27  **refer to Attachment #2: Investigation Narrative, referrals dated 12/22/14, 2/23/15, and 3/18/15.**

28

On 3/3/15, after the Department had received an additional report, the social worker met with Sun Shine and asked how she felt about living her mother, Sun Shine stated "I've never looked for inspiration in my mom" and explained that the situation had always been this way at home.

After meeting with Sun Shine that day, the investigating social worker met with Kelly Olson, her counselor through the Wraparound and Children's Mental Health program. Ms. Olson stated that the mother recently refused to participate in the wrap program and had refused to transport her daughter to her therapy sessions. The therapist also stated that Sun Shine shared text messages with her from her mother that were very abusive in nature. She said that one of the text messages that Ms. Popovich sent to her daughter stated, "You're a whore". **Please refer to Attachment #2: Investigation Narrative, referrals dated 12/22/14, 2/23/15, and 3/18/15, as well as Attachment #12: Text messages from Ms. Popovich to the probation officer, pages 1 and 2.**

Ms. Olson said that Sun Shine did not want to continue attending Scotts Valley High but her mother refused to consider alternative schooling for the teenager. Since Sun Shine is not allowed to stay at her house during the day and she is not going to school, the teenager has been spending each day out on the streets. The therapist said that despite the negative situation at home, Sun Shine was reluctant to consider any alternate living arrangements. Ms. Olson said that Sun Shine was very afraid to try anything new and would choose to live in an abusive situation since it is all that she has ever known. **Please refer to Attachment #2: Investigation Narrative, referrals dated 12/22/14, 2/23/15, and 3/18/15.**

On 3/18/15, the social worker met with Sun Shine again, after she had been placed in protective custody at her probation hearing. The social worker talked with the teenager about the reported sexual assault that occurred when she was away from home. Sun Shine admitted that she hadn't gone home on Friday or Saturday, stating that her mother was angry with her and had ripped apart her room, tore everything off of the walls and bagged up all of her stuff.

Sun Shine said that when her mother was angry she called her names like "whore", "slut", "bitch", "bum", and "drug addict". **Please refer to Attachment #2: Investigation Narrative, referrals dated 12/22/14, 2/23/15, and 3/18/15.**

The following day, the social worker met with the mother, Katrina Popovich. Ms. Popovich said that she found journals in her daughter's bedroom in which Sun Shine spoke about doing drugs and wanting to kill herself. The mother said that the journals showed "intense sadness and depression and hormonal insanity". The mother went on to describe Sun Shine as "a thief", who, like her father, had stolen money, and was "a pathological liar", who might also be a sociopath. **Please refer to Attachment #2: Investigation Narrative, referrals dated 12/22/14, 2/23/15, and 3/18/15.**

When asked about her reasons for failing to participate in the wrap around program, Ms. Popovich said that as soon as she found out that her daughter was taking "pornographic" pictures, she decided she was not willing to participate in the therapy with Sun because she felt that she wasn't being her "authentic self". The mother went on to say, "I will not engage in emotions that will encourage her to continue". Ms. Popovich also said she didn't want to transport Sun Shine to appointments because she was "in fear of her". "I shouldn't have to expose my other children to her wrath and her rage." she stated. The mother went on to say that many of Sun Shine's appointments occurred while she was working and that her daughter was capable of getting rides everywhere. **Please refer to Attachment #2: Investigation Narrative, referrals dated 12/22/14, 2/23/15, and 3/18/15.**

The following week, on 3/23/15, the social worker spoke with Sun Shine's probation officer, Suzanne Reese. Ms. Reese stated that Sun Shine's family was admitted to the Wraparound program, which involved weekly meetings with the child, parent, probation officer, counselor, facilitator and family partner, as well as individual counseling sessions. Ms. Reese said that the services began on 2/5/15. She said that the mother attended approximately two sessions and on 2/17/15, she sent a text message to the probation officer stating, "I will no longer be participating in this wrap around program. My help is no longer useful and I can't be around her anymore.

I prefer that she become a candidate for a group home or out of home placement. I left her at Court. She's on her own to figure out how to get to all of her meetings from now on. I can no longer stand to be near her." **Please refer to Attachment #2: Investigation Narrative, referrals dated 12/22/14, 2/23/15, and 3/18/15, as well as Attachment #13: Text messages from Ms. Popovich to the probation officer, pages 1, 2&3.**

After speaking with the probation officer, the investigating social worker contacted Kelly Olson, Sun Shine's counselor through the wrap around and Children's Mental Health program. Ms. Olson said that she had only been working with Sun Shine for the past two months but "from the get go" she was met with resistance from the mother. The counselor said that she was not able to obtain permission from the mother to work with Sun Shine in counseling until the Court ordered the mother to do so. Ms. Olson further stated that Ms. Popovich recently sent a text stating that she was not willing to participate in the wrap program and had also refused to bring her daughter to appointments. Ms. Olson said that Sun Shine was good about making her own arrangements to insure that she made it to therapy. **Please refer to Attachment #2: Investigation Narrative, referrals dated 12/22/14, 2/23/15, and 3/18/15, as well as Attachment #13: Text messages from Ms. Popovich to the probation officer, pages 1, 2 & 3.**

Ms. Olson further stated that Sun Shine herself was initially resistant to therapy but had then become very attached to her. She said that she thought the mother's actions had a direct impact on the child's behavior. Ms. Olson said that Ms. Popovich frequently sent her daughter text messages stating things like, "You disgust me. You're trash to me. You're nothing but a whore. I disown you". Ms. Olson said that every time the mother sent a text message it seemed to be "nasty". The counselor said that Sun Shine would read the messages in front of her and would sit in the session and cry. She stated that the child felt like an outsider in her home and the mother's behavior has had "a terrible impact on her".

Ms. Olson further stated that she thought the teenager was abusing drugs and alcohol in order to numb herself out", as the child was in "a lot of pain emotionally and doesn't want to feel it." **Please refer to Attachment #2: Investigation Narrative, referrals dated 12/22/14, 2/23/15, and 3/18/15.**

The following day, 3/24/15, the social worker contacted Sun Shine's older sister, Summer Popovich. Ms. Popovich said she was aware that Sun Shine was in a group home placement and said she knew that Sun Shine wanted to go home but stated, "My mom does not care. There has been no caring for me and Sun Shine for a long time in the family." Ms. Popovich continued, "My mom has had disgust and hatred for Sun for a long time and when I left, it just got worse. It was not a good parent situation. She takes no responsibility. She wants Sun Shine out of the house for good". **Please refer to Attachment #2: Investigation Narrative, referrals dated 12/22/14, 2/23/15, and 3/18/15.**

In the mother's written response to c-1 that she provided, Ms. Popovich summarized Sun Shine's hospitalization on 12/19/14, that was reportedly due to alcohol intoxication. Ms. Popovich stated that Sun Shine's friends called the police and then contacted her late at night, initially reporting that Sun Shine had been using heroin. Ms. Popovich said that her daughter was brought to the emergency room at 1:19am and that she arrived at the hospital at 2:45am. She said that she requested that Sun Shine be placed on a 5150 hold, as her daughter had told her friends that she "shot up" heroin and had made suicide threats in the past. **Please refer to Attachment #14: Mother's written response to c-1, pages 3 and 4.**

In her response to c-1, Ms. Popovich also wrote, "I am unable to transport Sun Shine to any appointment at this time", stating that her daughter is "very hostile, cusses, yells very loudly, and can get physical at times". She explained that she did take Sun Shine to at least two appointments with the WRAP program and had taken her to numerous counseling appointments, as well as "medical emergencies" in the past. **Please refer to Attachment #14: Mother's written response to c-1, pages 3 and 4.**

With regards to her written response to the allegations in c-2, Ms. Popovich denied calling her daughter a "slut, pathological liar or sociopath", stating that "name calling is not a common occurrence on my part". The mother did admit that she may have called Sun Shine a pathological liar and a sociopath to medical and mental health physicians or Child Protective Services social workers, with the intent that her daughter obtain "much needed help for her mental problems". Ms. Popovich stated that she has found many clothing items belonging to Sun Shine that are "inappropriate for her age" and for "public wear" and that she informed Sun Shine that these items are worn by "sluts and whores". The mother further stated that she has explained to her daughter that if she continues not attending school she is going to be a "bum, loser and homeless person", as a method to try and convince her to go to school. Ms. Popovich expressed agreement that her daughter suffers from suicidal ideation, depression and substance abuse, and wrote that she believed this "emotional torment" is a result of the abandonment of the child's father. **Please refer to Attachment #15, Mother's response to c-2.**

The undersigned was not able to obtain a response from the father to the allegations in c-1 and c-2, as he has not made himself available to be interviewed.

**g-1 The father' Shannon Popovich's current whereabouts are not known to the Department. His ability and/or willingness to provide for the minor will need to be assessed once he is located.**

The undersigned made several efforts to contact the father, Shannon Popovich, to discuss the allegations in the petition and notify him of the upcoming hearings. Messages were left at two different telephone numbers on 3/24/15 and at three different telephone numbers on 4/15/15. Additionally, notice of the hearing was sent to Mr. Popovich at three different addresses. He has yet to respond to any of the messages and has made no contact with the Department. His current whereabouts remain unknown.

## DISPOSITION

### Social Study/Family Assessment

#### Problems Requiring Intervention

1. Lack of adequate supervision
2. Lack of healthy, appropriate and supportive parenting
3. Mother's failure to meet the child's emotional, medical and mental health needs
4. Father's absence
5. Mother's failure to accept responsibility for problems at home
6. Child's serious emotional problems/risk taking behaviors

#### Family Strengths:

Sun Shine is a bright, articulate, and capable young girl with tremendous potential. Her mother, Katrina Popovich, is also very capable and determined. If Ms. Popovich uses her determination to access resources and improve her relationship with Sun Shine, significant change may occur in the family dynamics.

#### Family's Perception of Their Needs and Strengths:

When asked why she needed to be more successful with her daughter, the mother stated, "I need Sun Shine's cooperation and honesty. I follow the rules; she needs to follow the rules. I think I've been an awesome parent to her and my younger children. I provide for them financially and morally and get her to all of her appointments". Ms. Popovich said she did not feel that counseling would help her with her parenting. She stated, "I'm a good mother. It takes two to tango." Ms. Popovich said that she believed that her daughter's drug use contributed to her problems and said, "She has to do her part; I've done my part. She's made a lot of the choices that have put her where she's at, on her own. She's had near death experiences; you'd think that would bring someone up to par".

When asked what she thought Sun Shine needed from her, the mother stated, "Love, understanding, compassion, sympathy, empathy and money." Ms. Popovich went on to say that she thought her daughter would benefit from counseling and blamed her problems on her dad abandoning her, stating, "She would have been a whole other girl if her father hadn't left; that would fix Sun".

**Relevant Social, Cultural, and Physical Factors:**

The mother said that she grew up in Walnut Creek, Livermore and Pleasanton, and met the father, Shannon Popovich when she was in High School. She said that she had Sun Shine's older sister, Summer, and that she and the father then got married. Ms. Popovich said that she and the father "tried to cohabitate" a couple of times. She said that they had a house in Fremont but the father "trashed the house". The mother described Mr. Popovich as "violent" and "very aggressive". She said that he never "full-on punched" her but did do a lot of pushing and shoving. Ms. Popovich said that her husband never worked to provide for the family and didn't support her efforts to pursue an education. She said that she eventually filed for divorce after finding bags of methamphetamine that he had been keeping in the house.

Ms. Popovich said that after leaving her husband, she and her daughters, Summer and Sun Shine, who was still a baby, moved in with her parents. She said that she got her bachelor's degree in political science and pre-law and worked 40 hours a week while her parents helped to care for the children. The mother said that she got a job working at a law firm where she has continued to work for the past 14 years. She said that she met her current husband, Bunker Rogge, 12 years ago and got married two years later. According to Ms. Popovich, Mr. Rogge has two children of his own who are now adults, and they have two children together, with one on the way.

The undersigned was unable to obtain a social history from Mr. Popovich, as he has not made himself available to be interviewed.

**Statements**

**Parents/Legal Guardians:** The mother, Katrina Popovich, stated, "I would like to see Sun Shine healthy, happy, and safe."

The father, Shannon Popovich, was not available to make a statement.

**Child's:** "I want to go home. I do not believe that my mom is a bad mother. I want to be with my mom. That is the only place that I will truly be happy."

**Reasonable Efforts**

1. Referred family to counseling both during prior and current investigations

2. Developed safety plan with mother prior to removal

3. Interviewed mother to assess for risk and safety

4. Interviewed child to assess for risk and safety

5. Interviewed extended family members to assess for risk and safety

6. Attempted to interview father to assess for risk and safety

7. Interviewed minor's probation officer to assess for risk and safety

8. Interviewed minor's mental health specialist to assess for risk and safety

9. Arranged placement

10. Reviewed prior child welfare history

11. Referred parents for counseling

12. Referral for parenting education

13. Referral for CASA

**Non-Reunification Issues (WIC 361.5)**

Non-applicable

**Consideration Of Placement With Non-Custodial Parent**

The Department is not considering placing Sun Shine with the father at this time, as the father has not made himself available to the Department in order to be assessed.

**Consideration Of Relative Placements**

On 3/19/15, the undersigned spoke with the mother about relatives. Ms. Popovich stated that there are no relatives currently available for placement. In addition to discussing possible relative placements with the mother, the social worker spoke with Sun Shine's aunt and her adult sister and attempted to speak with her father, as well as several other relatives. Thus far, there have been no relatives who have identified themselves as willing to be considered for placement.

**Concurrent Planning**

On 4/16/15, the mother was advised of the option to participate in adoption planning and to voluntarily relinquish the child for adoption if an adoption agency is willing to accept the relinquishment. Ms. Popovich said that she does not want to voluntarily relinquish Sun Shine for adoption at this time. The father has not been advised of the option to participate in adoption planning, as Mr. Popovich has not made himself available to the undersigned.

**Child**

**Regarding: Sun Shine Popovich**

**Medical and Dental**

Sun Shine currently receives her medical care at Foothill Community Health Center at 2380 Montpelier Dr. in San Jose (408-254-1800). Sun Shine was scheduled for a medical exam on 04/12/2015, but the appointment was cancelled after the minor was AWOL from her placement at California Anchor group home. On 04/14/2015, the group home staff reported that they would reschedule Sun Shine's exam now that she has returned.

Sun Shine currently receives her dental care from Dr. Yang at the Foothill Community Health Center at 2380 Montpelier Dr. in San Jose (408-254-1800). Sun Shine had a dental exam completed on 04/09/2015. At this appointment it was determined that Sun Shine needed to return for three follow up dental procedures. Sun Shine will receive a prophylaxis treatment on 06/02/2015, a filling on 06/04/2015, and another filling on 06/08/2015.

**Developmental**

Sun Shine is not currently a client of the San Andreas Regional Center. The minor does not present with any developmental delays.

**Educational:**

Sun Shine, who is in the 11th grade, previously attended Scotts Valley High School. After being placed at California Anchor Group Home, the minor moved to Silver Creek High School, which is located at 3434 Silver Creek Road in San Jose, CA. At this time, it is too early to determine whether or not she functions academically above or below average for the 11th grade, as she just enrolled at Silver Creek High School. Educational rights rest with the mother, Katrina Popovich. The Education Rights Holder is able and willing to fulfill her obligation in this role.

### Educational Stability Plan

#### Determination of Out of Home Placement

Sun Shine's current placement resulted in the removal from her school of origin, Scotts Valley High School. The mother was aware that her current placement would mean a removal from her school of origin.

#### Determination of Best Interest for Remaining in School of Origin/Stability

I.   **Coordination with Schools.**
     The school of origin was notified of the change in schools on 03/20/2015, when Sun Shine was placed at California Anchor group home. The school of origin did not report any concerns about Sun Shine moving to Silver Creek High School.

II.    **Decision of the Educational Rights Holder**

The Education rights holder is the mother, Katrina Popovich. The Education Rights Holder is able and willing to fulfill her obligations in this role. The Education Rights Holder believes that it would be in Sun Shine's best interest to attend her new school, Silver Creek High School, as long as she is residing at the group home.

III    **Coordination with Caregiver**

Efforts were made to find placement near the school of origin but there were no placements available at the time. California Anchor group home does not have the resources to transport Sun Shine from Santa Clara County to her school of origin in Santa Cruz County.

III.    **Efforts to Provide Immediate Enrollment.**

Sun Shine was enrolled at Silver Creek High School shortly after being placed at the California Anchor group home.

**Mental and Emotional Status**

Sun Shine has been participating in therapy with Kelly Olson at Children's Mental Health Services through the Wraparound program. On 04/14/2015, the ongoing worker left a message with the minor's previous private therapist, Barbara Bailey-Porter, asking for information about her work with Sun Shine, but has yet to receive a return telephone call.

**Special Needs of Minor as a Parent**

Non-Applicable

**Out Of Home Placement**

**Regarding: Sun Shine Popovich**

**Current Placement**

On 03/20/2015, Sun Shine was placed into protective custody and transported to the California Anchor group home in San Jose, CA. According to the house manager, Ms. Washington, Sun Shine has been attending school regularly and following the house rules.

On 3/30/2015, there was an incident at the group home between Sun Shine and another resident at the group home. Ms. Washington reported that Sun Shine did not instigate the altercation, and the other resident was removed from the home after the incident. Sun Shine has reported that she wants to be placed in Santa Cruz County, and the Department is currently seeking alternative placements for Sun Shine. On 04/08/2015, the post disposition social worker took Sun Shine to be interviewed at the Haven of Hope group home in Aptos, CA. Sun Shine is currently on their waitlist.

On 4/14/2014, the ongoing worker was informed by California Anchor group home that Sun Shine was put on AWOL status on 4/10/2015, and again on 4/11/2015 - 4/12/2015. On 4/10/2015, Sun Shine was given a pass and returned to the group home 30 minutes past curfew. On 4/11/2015, Sun Shine left on another pass and was expected to return to the group home at 10:00 p.m., but she did not call the group home and did not return until after 10:00 p.m. the following day. As of 4/14/2015, Sun Shine is currently on restriction at the group home.

**Sibling Placement**

Non-applicable

**Independent Living Plan Services**

A Transitional Independent Living Plan and Agreement (TILP) was completed with Sun Shine on 04/15/2015. **Please refer to Attachment #16: Transitional Independent Living Plan & Agreement**

**Visitation**

At the detention hearing held on 3/25/2015, the Court ordered two supervised visits per week between Sun Shine and the mother. On 4/14/2015 California Anchor group home staff reported that the mother had visited Sun Shine on 3/29/2015 for one hour and on 4/05/2015 for one hour.

The mother and Sun Shine also had a visit scheduled for 04/12/2015, but this visit was cancelled due to Sun Shine's AWOL status. The group home staff reported that the visits on 3/29/2015 and 4/05/2015 went well and there were no concerns reported. The group home stated that they are aware that the mother's court order is for two visits per week, but the mother has not scheduled a visit on a day other than Sunday due to her schedule and distance from the group home.

**Assessment/Evaluation**

Before the Court is the minor, Sun Shine Popovich, a child described by Welfare and Institutions Code 300 (b), (c) and (g). The Department respectfully recommends that the Court take Jurisdiction to insure the minor's safety and that Sun Shine remain in out of home placement and that her parents, Katrina and Shannon Popovich, receive family reunification services. The minor is currently at risk of abuse and neglect due to mother's failure to provide adequate supervision and medical and mental health treatment, and her unwillingness or inability to relate to her daughter in a healthy, supportive and non-abusive manner. Sun Shine is at further risk due to her father's failure to provide regular care for his daughter and to insure that she is protected from abuse and neglect while in the care of her mother.

The Department has received six different reports regarding the family during the past 15 years, the last four involving concerns about a lack of supervision and the mother's failure to provide appropriate medical and mental health treatment, as well as emotional support. The mother, Katrina Popovich, presents as articulate and capable but takes no responsibility for her daughter's acting out behavior or for the serious problems between them. Sun Shine presents with significant emotional problems and increasingly dangerous, life threatening, risk-taking behaviors, which her mother is either unable or unwilling to appropriately address. Thus far, Ms. Popovich has not been able to express any positive regard for her daughter to the social worker, probation officer, counselor, and most importantly, to Sun Shine herself. She instead conveys an attitude of resentment towards the teenager which borders on contempt. As long as the mother perceives her daughter in this light, it will be very difficult for the child to rise above it to become a healthy, happy and successful adult.

The father, Shannon Popovich, has been largely absent from his daughter's life for many years. Mr. Popovich has failed to provide the teenager with regular care, supervision, emotional support, and with any protection from the abuse and neglect of her mother. The father has a history of substance abuse that spans 20 years that has prevented him from being a healthy caretaker and a positive influence in his daughter's life. Of particular concern, is the recent father's lack of contact with the Department, even though aware that his daughter has been removed from the mother and placed in a group home.

The family's prognosis will be determined by the father's willingness to participate in services with the Department and to develop a healthy and protective relationship with his daughter, and in the mother's ability to utilize counseling and parenting education to recognize her part in the development of Sun Shine's problems, so that she is able to see her daughter's current behavior and future potential in a more realistic, healthy, and positive way. And perhaps the greatest predictor of future success will be in the ability of Sun Shine herself to rise above the past, create healthier relationships, and to utilize her many attributes to be the healthy, happy and successful young adult that she is capable of being.

**Case Plan**

See attached.

**Attachments**

The attachments identified in this report are attached hereto and incorporated herein by this reference.

1. Investigation Narrative, referral dated 4/23/14

2. Investigation Narrative, referrals dated 12/22/14, 2/23/15, and 3/18/15

3. Juvenile Probation Court Report, Case #J23350

4. Pictures of the minor's poison oak reaction, pages 1&2

5. Text messages sent from Ms. Popovich to the probation officer

6.  Text messages sent from Ms. Popovich to the probation officer

7.  Text messages sent from Ms. Popovich to the probation officer

8.  Text messages sent from Ms. Popovich to the probation officer, pages 1&2

9.  County of Santa Cruz Juvenile Case Referral dated 3/17/15.

10. Mother's written response to the allegations in b-1.

11. Mother's response to the allegations in b-2, pages 1&2.

12. Mother's written response to b-3.

13. Text messages from Ms. Popovich to the probation officer, pages 1, 2&3.

14. Mother's written response to c-1, pages 3&4

15. Mother's written response to c-2.

16. Transitional Independent Living Plan & Agreement

**Recommendation**

Adopt the proposed findings and orders.

**Respectfully Submitted,**

Cecilia Espinola
Santa Cruz County Human Services Department

**By**

_Carolyn Sprague_                                                    4/21/15
Carolyn Sprague, Senior Social Worker, SN14, (831)454-4181

_Raven Harris_                                                       4/21/15
Raven Harris, Social Worker Supervisor II, In-box caseload SN10, (831)    Date
454-4386

*I have read and considered the above report.*

_____

**Judicial Officer**

_____

**Date**

## PROOF OF SERVICE BY MAIL

I, the undersigned, state that I am a citizen of the United States and employed in the County of Santa Cruz, State of California, that I am over the age of eighteen and not a party to the within action; that my business address is 1400 Emeline Avenue, Santa Cruz, CA 95061. On the date set below, I placed for service by mail:

### JURISDICTION/DISPOSITION REPORT

by enclosing them in an envelope and placing the envelope for collection and mailing following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid. Addressed as follows:

| | | |
|---|---|---|
| Caretaker | Katrina Popovich | Shannon Popovich |
| Address Confidential | 211 S. Navarra Dr. | 1116 Main Ave |
| | Scotts Valley, CA 95066 | Sacramento, CA 95835 |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed, April 21, 2015 Santa Cruz, California.

Pat Broad
Human Services Department

DP003017
CONFIDENTIAL DOCUMENT: By court order, these documents are confidential. If you copy, distribute, or disclose these records, you may be in contempt of court.

## PROOF OF SERVICE
## COURT FILE DRAWER

I, the undersigned, state that I am a citizen of the United States and employed in the County of Santa Cruz, State of California. I am over the age of eighteen and not a party to the within action.  My business address is 1400 Emeline Avenue, Santa Cruz, CA 95061 and on the date set out below, I served a true copy of the following:

### JURISDICTION/DISPOSITION REPORT

by placing said document in the pick up drawer in the designated files of the following persons at Superior Court, 1 Second Street, Watsonville, CA 95076..  I am readily familiar with this business practice of collecting and processing correspondence for deposit and collection at the address shown above.

Robert Patterson
100 Doyle St., #A
Santa Cruz, CA 95062

Evguenia Vatchkova
343 Soquel Ave #149
Santa Cruz, CA 95060

CASA
813 Freedom Blvd
Watsonville, CA 95076

Shannon Sullivan
701 Ocean St., Rm. 505
Santa Cruz, CA 95060

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed, April 21, 2015 Santa Cruz, California.

Pat Broad
Human Services Department

DP003017
CONFIDENTIAL DOCUMENT: By court order, these documents are confidential.  If you copy, distribute, or disclose these records, you may be in contempt of court.